[Civil No. 4372.   Filed December 1, 1941.]

[119 Pac. (2d) 569.]

ELAM OLSEN, Appellant, v. UNION CANAL AND IRRIGATION COMPANY, a Corporation, J. H. ASAY, and ROY A. LAYTON, Appellees.

Mr. John W. Ross, for Appellant.

Mr. Guy Anderson, for Appellees.

LOCKWOOD, C. J.—This is an appeal by Elam Olsen, plaintiff, from a judgment in favor of Union Canal and Irrigation Company, a corporation, called the company, J. H. Asay and Roy A. Layton, defendants. The facts upon which the appeal must be decided are not in serious dispute, and may be stated as follows:

In 1874 various farmers in the Safford valley, in Graham County, began to irrigate their lands from the Gila River. A number of canals were constructed by the mutual efforts of the landowning farmers among them being what is known as the Union canal. During the many years of its existence it has been enlarged and improved and different areas of land have been irrigated therefrom. It does not appear from the record in whom the original title to the canal property was vested, but in 1891 the Union Canal and Irrigation Company was incorporated, under chapter 2 of title 12 of the Revised Statutes of Arizona of 1887, Civil Code, being the general law covering the ordinary profit-seeking corporation, and the title to the canal and its appurtenances passed to this corporation. Its capital stock was divided into one thousand

shares of the par value of $25 each, and the usual provisions found in the charters of similar corporations were included. Its purposes were stated as follows:

"2. The general nature of the business of said Corporation is to acquire and own all the property, franchises and privileges of the Union Canal Company and also the Mill Ditch and all its branches and the dam in the Gila River *M*aintained enlarge, increase, extend and lengthen such ditches for conducting water therein from the Gila River and other sources for irrigation and distribution thereof to stock holders, then of furnishing water for op*poro*ting mills and for sale of water to others. The Contract with C. Layton and the Union Canal Company to remain valid in these articles."

It will be seen that its object was the furnishing of water for irrigation to stockholders and non-stockholders of the company, and for the operation of mills. For many years the company continued operating under this charter substantially as follows: The shareholders of the company were assumed to be entitled to the use of water from the Gila River, through the canal, in proportion to the amount of stock owned by them. Whenever there was a greater quantity of water than was needed by the shareholders for the irrigation of their lands, it was furnished indiscriminately to farmers having lands lying under the canal, many of whom owned little or no stock therein. When, however, the water diminished in quantity, it was delivered only to, or upon the order of, the stockholders, regardless of the date on which the water had first been applied to the lands lying under the canal, or of what lands the water was to be used upon. In other words, the theory was that the right to the use of water followed the ownership of stock in the canal, and not the ownership of land lying under it and which

had been irrigated therefrom. As a corollary to this theory the practice grew up of the owners of the stock renting the use of their shares to any person who had lands which he desired to irrigate, upon such terms as the owner of the stock saw fit to fix, and water was delivered to the lessee for such application as he might choose.

The first adjudication of the right to use the waters of the Gila River in the Safford valley was made in what was commonly known as the Doan decree in the last years of the last century or the very early years of the present one. This adjudication, however, was not made to the individual lands but rather to each of the various canals of the valley in a lump quantity, and they were allowed to apportion the water so adjudicated to them in such manner as their management saw proper, most of them following the method above indicated. In 1935 the question of the respective priorities to the use of water in the Virden, Duncan, Safford, Winkleman and San Carlos valleys of the Gila River came before the federal district court of the southern district of Arizona, and that court, following as it was compelled to do under the decisions of the Supreme Court of the United States the law of Arizona in regard to the priority of appropriation and use of the public waters of the state, adjudicated the respective priorities of the irrigated lands of the valleys above mentioned by specific acreage instead of by the canals serving the land.

The lands of plaintiff involved in this proceeding, and adjudicated by the federal court in its decree, were first placed in irrigation between the years 1874 and 1904. During this time they drew their appropriated water through another canal known as the Sunflower. This canal, however, was washed out a number of times by floods, and in 1916 plaintiff com-

menced taking his water from the river to a great extent at least through the Union canal, and this custom was continued, with the consent and approval of the company, up to the time of the beginning of this suit.

In 1938 the charter of the original Union Canal and Irrigation Company was about to expire and a new corporation was formed with the same name, which took over the Union canal. Its purposes were described as follows:

"Article II. The enterprise pursuit, business and occupation in which this corporation proposes to engage is the owning, maintaining, keeping in repair, enlarging, and extending the said Union Canal for irrigation, and domestic purposes; to acquire water and water-rights; to construct and maintain canals, ditches, flumes, dams and reservoirs for the purpose of conducting, storing and distributing water so acquired; to the various appropriators and owners of water rights upon lands under the said Union Canal for irrigating and domestic uses; and to do and transact any and all kinds of business which may or might be done by a natural person that may be necessary or expedient to carry out the objects of this corporation, including the right to own, mortgage and deal in such real estate as shall be necessary or convenient for its purposes."

Its capital stock was fixed at one hundred thousand dollars, divided into eight thousand shares of the par value of $12.50 each, and most of this stock was eventually issued to the holders of stock in the old corporation in the proportion of 7.4 shares of stock in the new company for each share held in the old one. During the time the old company had continued in existence its shares of stock were transferred without regard to the ownership of land irrigated by the canal so that there was no relation between the number of shares owned by a stockholder and the land owned by him.

Since, under the practice obtaining, only the owner or lessee of this stock was able to obtain water from the canal, in time of shortage the stock was frequently leased at a very high rate per annum and the value thereof rose until sometimes it was sold at from three to five hundred dollars per share, although its par value was but $25. As a result when stock in the new corporation was issued there were many of its stockholders who had a far greater number of shares of stock than they had acres of land subject to irrigation, while a large number had a much smaller number of shares than their acreage. These respective stockholders were characterized during the trial as the ''long'' and ''short'' stockholders.

It was recognized after the decree of the federal court that the water would have to be distributed in accordance with the priorities adjudicated by that court instead of as previously in accordance with the ownership or the lease of stock in the company. This left the long stockholders with stock which they could no longer sell nor lease for the purpose of entitling the purchasers or lessees to the use of water by reason thereof, while the short stockholders were entitled to receive their water on the basis of their priorities regardless of their lack of ownership of stock. The result was that many of those who had purchased stock at a very high rate found it relatively worthless. They felt they had invested a large sum of money on which they would receive no return, while those landholders who had no money invested in stock, or who had disposed of most of their original stock, would receive all the benefits of the canal system without bearing their fair share of the burdens. A scheme was, therefore, evolved which it was thought would allow the long stockholders to continue to profit to some extent at least by their investment. Substantially speaking,

it was this: While the articles of incorporation provided that the par value of the stock was $12.50, an arbitrary valuation was fixed thereon at $35 per share by the company, based upon an estimated average value of the original stock of approximately $260 per share, and the company demanded that the short stockholders, in addition to their proportionate share of the actual operating expenses of the canal, pay to a pool held by the corporation for the benefit of the long stockholders 6% per annum on the $35 valuation for as many shares of stock as they were short in proportion to the acreage irrigated by them. This pool was held by the corporation as the agent of the long stockholders and was paid out to them in proportion to the stock of which they were long. *And the payment of this 6%, as aforesaid, was enforced by the company under threat of shutting off the water for irrigation from the short farmers who had failed to make such payments in proportion to the amount of stock they were short.*

This suit was brought to enjoin the company from shutting off from plaintiff, who was a short stockholder, of the water to which he was entitled under the decree of the federal court, until and unless he made the payments into the pool as above set forth.

The question for our consideration is whether the company had the right to shut off the adjudicated water from plaintiff unless and until he made such payments. This involves a somewhat lengthy consideration of the water law of Arizona. The policy followed by the company for so many years was one which was originally carried on by most of the early irrigation systems in this state. Practically all of our early canals were built by the mutual efforts of the farmers thereunder, and since they were voluntary organizations they were maintained by the labor fur-

nished by those who irrigated the land, in proportion to the acreage irrigated. As the irrigated area of the state grew, necessarily the expense of maintaining the different canal systems grew greater, and difficulty was experienced in getting each of the water users to perform his proportionate share of the labor of maintenance. Gradually these voluntary unincorporated organizations changed their form to the ordinary profit-seeking corporate form, similar to that of the company herein, and since the shares of stock could be sold without regard to the ownership of the irrigated land, it was not long until a large amount of the stock passed into the hands of those who were interested primarily in the canal as a money-making scheme, rather than as an instrumentality for the irrigation of the land thereunder. The custom quickly arose of the owners of stock leasing the use of their stock, which by common consent was assumed to carry the right to use the water conveyed in these canals, and those farmers who had improvidently sold their stock soon found themselves dependent for their entire existence upon the paying of a rental for the use of stock which varied in proportion to the demand for water for irrigation, which in turn depended on the amount of land which it was desired to place under cultivation from year to year. A farmer who could afford to pay this year's rental might not be able to pay the next year's higher rate, and he was compelled to see the land upon which he had spent perhaps half a lifetime in making a home go back to the desert, because later comers could afford to pay a higher rental for the stock than he could. The situation became intolerable, and the matter was taken into the courts for adjudication as to just what were the respective rights and responsibilities of the different canal companies and their stockholders and the landholders thereunder.

The supreme court of the territory finally laid down our fundamental water law on the subject in the famous cases of *Slosser* v. *Salt River, etc.,Co.*, 7 Ariz. 376, 65 Pac. 332, and *Gould* v. *Maricopa Canal Co.*, 8 Ariz. 429, 76 Pac. 598, in the years 1901 and 904. The principles therein stated have been consistently followed by this court ever since, and the legislature has recognized and approved them as being correct. The cases are long and we need not discuss the factual situation therein more than to say it was in most material respects practically identical with the circumstances which form the background in the present case. Our holding in the Slosser case may be summarized as follows [7 Ariz. 376, 65 Pac. 338]:

" . . . We hold that the ownership and possession of arable and irrigable land are essential, under the statutes, for the acquisition of the right of appropriation of water from a public stream for purposes of irrigation. We hold that a corporation not the owner or possessor of arable and irrigable land may lawfully construct a dam, canal, or other conduit of water, and divert from such stream water for purposes of irrigation, but that in so doing it becomes in no sense an appropriator or owner of the water so diverted. Its status is that of either a private or public agency, depending upon whether its diversion is for the purpose of supplying owners or possessors of arable and irrigable land with whom it has fixed contractual relations, binding it to perform such service, or whether its purpose or practice be to supply owners or possessors of such land who are not its water-right holders, or with whom it has not bound itself by contract to permanently render such service. If it confines its service as the private agent of certain appropriators, it cannot be compelled to render service to others. On the other hand, if it undertakes to and does divert and carry water for the use of consumers with whom it is not bound by such contracts, and hence becomes a public agency, it cannot, under the law, discriminate by giving preference otherwise than with due regard

to priority of appropriation. We further hold that a shareholder in such a company, who is also a water-right holder by virtue of his ownership of such share of stock and the ownership or possession of arable and irrigable land irrigated by means of such water-right, may not assign such water-right to another, to be used upon lands which the assignor does not own or possess, for any particular season, so as to confer upon the assignee his priority of right, and that such company does not possess the right to discriminate in favor of such holders, as against other appropriators of water under its canal, who were prior in right. In other words, a water-right, to be effective, must be attached to and pertain to a particular tract of land, and is in no sense a 'floating' right. . . . We hold further, therefore, that the defendant company, by adopting and continuing the practice of supplying water to others than its water-right holders owning or possessing arable and irrigable land, not being itself an appropriator of the water carried, or the owner thereof, and dealing, as it was, with public property, became a public agency to the extent that plaintiff at the time he made his application for water, although not a water-right holder of the company, was entitled, upon the payment of the charge for similar service made to other non water-right holders, whether holders of orders from water-right holders or not, to have delivered upon his lands water sufficient for the irrigation thereof, in preference to other non water-right holders whose appropriations were subsequent in time, and that he is entitled to this service upon the same terms and conditions, so long as the defendant company continues to supply water to consumers under its canal who are not its water-right holders, whether upon the order of the latter or not, and thus continues to assume the status of a public agency in the diversion and carriage of water. . . . ''

We made one general exception to this rule in regard to ''floating'' water rights, which was to the effect that when the land covered by the appropriation was so damaged as to render it incapable of further cultivation, the holder of the right of appropria-

tion might transfer it to another piece of land, either directly or by sale to another person, but such transfer was permanent in its nature and subject in the future to the same limitations as the original right.

In the Gould case we had to consider more fully the duty of canal companies like the company herein as carriers of water, and we modified that portion of our decision in the Slosser case as to the superior rights of the stockholders to non-stockholders so far as the carriage of water is concerned, and said [8 Ariz. 429, 76 Pac. 601]:

" . . . As a *quasi* public servant, having received benefits from the public, such a canal company owes a duty to conduct its business as a carrier of water in such a way as may best promote the interests of the community, when this may be done without sacrifice of any of its rights of property. The community is interested in the permanent reclamation and improvement of lands. If a right of appropriation might be made of no use to its holder through the refusal of a canal company to divert and carry the water to which such holder is entitled, and which the canal company has theretofore diverted and carried, the holding of such right of appropriation by such a precarious tenure would not only impair its value to the holder, but would discourage the making of improvements and the putting of the land to which it is attached to its highest and best use. To the extent, therefore, that such a canal company has diverted and carried water from a public stream, and to the extent to which this water has been applied by appropriators for the necessary irrigation of their lands, the canal company must continue this service so long as such service is required by said appropriators and the water is available from the common source. Should the water not be available, of course, the company cannot suffer any liability to its appropriators, for the measure of its duty is its ability to comply with the reasonable demands of appropriators. . . .

"If applications for water be made during any season in excess of the capacity of the canal to furnish

it, the canal company would have the right, and, indeed, it would be its duty, to limit the contracts for the season to its capacity and to those appropriators possessing the older rights of appropriation. In making its contracts for such service it can easily guard against incurring liability to appropriators by reason of the amount of water available from the Salt river being insufficient to supply their needs.''

■ While we did not specifically hold therein that canal companies of this nature are common carriers, yet we imposed on them a duty similar to the principal duty of common carriers; to carry the water of appropriators so far as the capacity of the canal permitted in the order of the priority of the land served, and upon equal terms. This also has been the law of Arizona for nearly forty years, affirmed by both this court and the legislature of the state.

■ It is evident from this statement of the facts and the law that defendant corporation in the present case and its predecessor in interest have violated the public water law of this state continuously ever since the decision in the Slosser and Gould cases, *supra*. So long as no owner of rights affected by such violations complained, this conduct might continue without interference by the courts. But the moment the situation was brought to our attention by proper legal procedure, we have no option but to declare and enforce our long established public policy. And as we have said in the very recent case of *Red Rover Copper Co.* v. *Industrial Commission of Arizona and L. L. Moody, ante,* p. 203, 118 Pac. (2d) 1102. ''No contractual consent, no statute of limitations, no laches nor estoppel can prevail against public policy, and any agreements made and any acts done in violation of it are necessarily void.''

■ We hold, therefore, that plaintiff Olsen was entitled to have water conveyed to him by defendant

company according to his adjudicated priority of appropriation so long as water was in the Gila River available for that purpose, upon the paying of the same reasonable rate charged all other appropriators of water served by the canal for that service, regardless of whether he did or did not own a single share of stock of the company. Nor could he under any pretext be required to pay any additional sums, under penalty of having his rightful supply of water shut off.

It is urged that such a rule is highly inequitable, in that the short stockholders would be permitted to use the Union canal without adequate and just compensation to the long shareholders who had, at great expense to themselves, built and improved it. We quite agree with defendants that the owners of the canal company, to-wit, the shareholders therein, are entitled to receive not only the cost of their services in carrying the water to those to whom it is their duty to supply that indispensable adjunct of farming in Arizona, but a sufficient sum to give a reasonable return on their investment in the canal property. This, however, may not be done in the manner in which defendants are now proceeding.

It was contended at the oral argument that the company and its predecessor were mutual nonprofit organizations and had for many years been conducted as such, with no profit or dividends. It is doubtless true they were conducted in such a manner that no dividends as such were earned or paid out, but their articles of incorporation and the evidence show clearly that, as a matter of law, they have always belonged to that class of corporations described in section 2, article XV of the Constitution of Arizona as public service corporations. The company, therefore, whenever it desires, may fix a reasonable rate per acre, sufficient to pay the cost of maintenance of its canal system

and a reasonable profit on its investment, to be charged of all irrigators alike, regardless of their ownership of stock, and out of its surplus thus realized it may pay dividends to its stockholders in the same manner as any other public service corporation.

The judgment of the lower court is reversed and the case remanded with instructions to enter judgment for plaintiff in accordance with the principles laid down herein.

McALISTER and ROSS, JJ., concur.