**BAGDAD COPPER CORPORATION, a corporation, Appellant,**

v.

**John Phillip ZANNARAS and J. P. Robinson, Jr., Co-partners, and U. S. Tungsten Corporation, Appellees.**

**No. 14248.**

United States Court of Appeals
Ninth Circuit.

Jan. 30, 1956.

Snell & Wilmer, Phoenix, Ariz., for appellant.

Joseph H. Morgan, Charles Christakis, Phoenix, Ariz., for appellees.

Before HEALY, POPE and FEE, Circuit Judges.

POPE, Circuit Judge.

The appellant, a Delaware corporation, here called Bagdad, and appellees Zannaras and Robinson, citizens of Arizona, were engaged in mining and milling of ores in Arizona. Bagdad was a subsequent upstream appropriator of water from Burro Creek. Zannaras and Robinson, here called defendants', held prior rights in the stream, diverting their water some seven miles below Bagdad's point of diversion. Each party had received from the State of Arizona a certificate of water right. That of Bagdad dated April 12, 1944, recites its right to 315,000,000 gallons of water per annum, with priority as of November 5, 1941. Defendants' certificate is dated January 2, 1945, and is for 3,000,000 gallons per annum, with priority from August 27, 1940.[1]

The action below was brought March 5, 1951, by Bagdad, alleging its own appropriation, and that defendants' purported certificate of water right was obtained by fraud in that defendants, in their proof of appropriation, falsely represented to the State Water Commissioner that they had actually applied the amount of water sought to be appropriated by them to a beneficial use. It was alleged that the Commissioner relied upon these false statements in issuing the certificate and hence defendants' attempted appropriation had lapsed

and was void. It was further alleged defendants had never, at any time, used more than one thousand gallons per year. Bagdad sought a decree that defendants' certificate was void and that any rights they may have had had terminated. The complaint prayed that plaintiff's rights be adjudged superior to those of defendants and that such right be quieted in plaintiff.[2]

In appealing from an adverse judgment Bagdad says that the record below compels a finding (1) that defendants' certificate of water right was obtained by fraud, and (2) that any right defendants may have initiated was forfeited because of non-use.

With respect to the charge of fraud, Bagdad says the false representations were contained in defendants' "Proof of Appropriation of Water", verified by oath, and filed with the State Land Commissioner on December 14, 1944. Executed upon a form provided for that purpose, it stated, under headings numbered 5 and 7, as follows: "5. State date water was completely applied to use: November 4, 1944", and "7. State quantity of water that has been applied to use: 3,000,000 gallons per annum."

To prove the alleged falsity of these statements Bagdad relies in main part upon sworn testimony given by Zannaras in an earlier case. The record shows that in July, 1945, these defendants had brought an action against Bagdad (known as Civil 129—Prescott), to recover damages for an alleged pollution of Burro Creek by Bagdad, and to enjoin continued pollution. In a deposition

1. Under the Arizona State Water Code, §§ 75–101 to 75–144, it is provided that the water flowing in streams belongs to the public and is subject to appropriation and beneficial use as therein provided. § 75–101.

Any person may appropriate and the person first appropriating shall have the better right. § 75–102.

The method provided for appropriation is by application to the commissioner for permit. § 75–105.

If the permit be granted, actual construction of the necessary work shall be

prosecuted with reasonable diligence and completed in not to exceed 5 years from the date of approval except that the commissioner for good cause shown may extend the time. § 75–109.

When it is made to appear to the satisfaction of the commissioner that the appropriation has been completed, he shall issue a certificate. The right acquired dates from the filing of the application. § 75–111, also alluded to infra.

2. During the trial U. S. Tungsten Corporation was added as a defendant, although the record does not show why.

given in connection with that action Zannaras testified that the stream was so polluted that he and his partner were unable to use the water and shut down their operations in December, 1943, and except for one day's operation in the latter part of 1944, they did no more milling until the spring of 1945. At the trial he again testified that after his diversion works and mill were ready to operate, water was used for a day or two in 1942 to mill about ten tons of ore; further, that in December, 1943, he milled seven to ten tons; that although he was then all set up to go, the creek started to become polluted and they had to stop; that they did no more milling until November, 1944 when again they had to stop using the water because of its pollution and that the water remained unfit for use until the time of the trial of the earlier action, in July 1945. He described the pollution as being so bad that the water ruined their pump and they had to haul water from another source for cooling their hoist engine and for making concrete.

Says Bagdad, this demonstrates the falsity of the defendants' proof of appropriation. For if the stream was so polluted that no more than these inconsequential uses could be made by defendants, they must have been making a false statement in their proof of appropriation that the water was completely applied to use by November 4, 1944, and that the quantity "that has been applied to use" was 3,000,000 gallons per annum.

Defendants say that when the proof was made they had demonstrated that "they had a beneficial use for 3,000,000 gallons annually", and that this was all that was required. The statute, § 75–111, A.C.A.1939, provides: "Upon it being made to appear to the satisfaction of the commissioner that an appropriation has been perfected and a beneficial use completed in accordance with the provisions of this article, he shall issue to the applicant a certificate, * * *." Bagdad proceeds on the theory that the showing must be that 3,-000,000 gallons were actually used in the period of one year, and that the proof filed made that representation.

If we inquire whether the requirement was satisfied by proof of beneficial use *at the rate of* 3,000,000 gallons per annum, we find no Arizona decision that furnishes an answer. The findings suggest that the trial judge held the view just suggested.[3] Possibly answer numbered 7, quoted above from the proof of appropriation, as to "quantity of water that has been applied" would be consistent with a statement that this quantity applied was "at the rate of" the stated quantity.[4] Defendants say that when, in the fall of 1944, they actually operated the mill, using water at the rate stated, their proof was adequate and was in conformity with the facts and the appropriation was then fully matured.

■ We find it unnecessary to resolve this difference between the parties as to the requirement of the Arizona statute and the meaning and significance of the statement made by defendants in their proof of appropriation. If we assume that Bagdad is right and that item 7 in the proof of appropriation amounted to a statement and representation that a full 3,000,000 gallons of water

3. Finding II contains the statement: "Substantial use of water was made by defendants prior to the time of making proof of appropriation, and they would have used the full allotment had it not been for the pollution of water by plaintiff."

4. Appellee makes reference to those decisions which have preserved priorities for appropriators who have required time in which to complete the application of water to the full extent of the contemplated beneficial uses, as where a farmer who has made diversion through an adequate ditch requires time to bring all his land under cultivation. If in such a case the appropriation is measured in miners' inches, or in second-feet, it is clear that the day such farmer, after using due diligence, finally applies the full quantity claimed to beneficial use, his appropriation is complete. Here with an appropriation measured in gallons "per annum", the answer is not so clear.

had been applied to a beneficial use by the defendants in the year preceding November 4, 1944, yet there is a complete obstacle to Bagdad's recovery in the court's finding that Bagdad's rights were barred by laches and limitations.

The court found: "The plaintiff had both actual and constructive notice of defendants' application for water permit and the subsequent proceedings including the proof of appropriation and issuance of certificate of water right on January 2, 1945. After such notice, it took no action for more than five (5) years. Any rights the plaintiff may have had are barred by laches and limitations." § 75–124, A.C.A.1939, provides that a certificate such as that issued to the defendants, shall be recorded in the office of the recorder of the appropriate county. This certificate was thus recorded on January 5, 1945. Under § 71–426, A.C.A.1939, this record constituted constructive notice of its existence to all persons. Not only that, but Bagdad was put on notice of the undoubted existence of such a certificate when the former action, Civil 129 Prescott, was brought against it, for in that action, filed February 17, 1945, the plaintiffs alleged and put in issue their claim that they were entitled to an appropriation of three million gallons of water per annum from Burro Creek.

If we adopt appellant's view that the proof of appropriation was required to show the full three million gallons actually used in one year, then it seems plain that when Bagdad in the course of the proceedings in that case learned through the testimony of Zannaras, alluded to above, that there had been the very slight use of water by these defendants in the period preceding the issuance of that certificate, the slightest thought upon the matter should have been sufficient to suggest that if such proof was furnished it could not accord with what Zannaras was now testifying. True, there is no proof in the record that after Bagdad heard the Zannaras testimony it actually examined the proof of appropriation. But we think that the trial court was fully justified in finding, as it did, that Bagdad had both actual and constructive notice of that application. And when Bagdad heard the Zannaras testimony the exercise of reasonable care and diligence would have led to its discovery of what it now says is a discrepancy between the proof of appropriation and the facts disclosed by Zannaras in the 1945 testimony.

The Arizona statute of limitations in enumerating actions which must be prosecuted within three years after the cause of action shall have accrued, lists actions for fraud in the following manner: "For relief on the ground of fraud or mistake, which cause of action shall not be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." § 29–203, A.C.A.1939. The Supreme Court of Arizona in applying that section has followed the rule generally applied by the courts with respect to similar sections as follows: "The doctrine deducible from the decisions is that the aggrieved party need not have actual notice of the fraudulent act to start the running of the statute, but, if the facts and circumstances were such as in the exercise of reasonable care and diligence he should have discovered the fraud, he is deemed to have notice. Where ignorance of the fraud is due to negligence or indifference or inattention, its discovery will be deemed to date from the time when one exercising reasonable diligence would have discovered it." Guerin v. American Smelting & Refining Co., 28 Ariz. 160, 236 P. 684, 687.

It seems too clear for argument that when Bagdad heard the Zannaras testimony in July, 1945, the exercise of reasonable care and diligence on its part would have led to a discovery of the claimed fraud, if fraud it was, and hence we conclude that the finding of the trial court that the action was barred by laches and limitations in and of itself compels a conclusion that Bagdad's prayer for cancellation of the certificate

and for judgment against defendants on the ground of fraud must be rejected.[5]

 Finally, appellant says that it should have had judgment on the ground that defendants had forfeited their right to the use of water through non-use. The statute, § 75–101, A.C.A.1939 provides in part:—"Whenever the owner of a right to the use of water shall cease or fail to use the water appropriated for five (5) successive years, the right to the use shall cease, and the water shall revert to the public and be again subject to appropriation." The trial court found that there was neither forfeiture nor abandonment of defendants' right; that there was no failure on the part of defendants to make beneficial use of water for five successive years. The evidence compelled this finding for there is no showing that any such period of time elapsed without at least some use of water by the defendants.

 It is the theory of the appellant that if an appropriator during any five year period fails to utilize all of his appropriation then a forfeiture occurs. The statute cannot have such meaning. On the contrary it is generally held in the western states where the doctrine of appropriation applies that no penalty attaches to the intermittent failure to use the owner's full appropria-

tion. When those occasions arise, the later appropriators benefit. If an appropriator were required at his peril continuously to use all of his appropriation this would tend to encourage waste. But such is not the law. The longest period of non-user shown is from December, 1943, to the spring of 1945. There was testimony that there was some substantial use of water by the defendants in each of the years thereafter. There was evidence that in a number of those years defendants were deprived of water for some periods because of Bagdad's pollution or improper diversion of the same. In Gila Water Co. v. Green, 29 Ariz. 304, 241 P. 307, 308, where it was asserted that a party had lost his water right through non-user following the destruction of the original dam, the court held that whether or not forfeiture occurred depended upon whether this party "since the destruction of the original dam has used due diligence under all the circumstances of the case to reconstruct and maintain the same." The trial court found that defendants "would have used the full allotment had it not been for the pollution of water by the plaintiff." The record sufficiently supports this finding of due diligence.

The judgment is affirmed.

---

5. Appellant contends that the defense of limitations is not available in this case, as it "is contrary to the declared public policy of the State of Arizona." It cites Olsen v. Union Canal & Irrigation Co., 58 Ariz. 306, 119 P.2d 569, 573, Corporation Comm. v. Pacific Greyhound Lines, 54 Ariz. 159, 94 P.2d 443, and Pacific Greyhound Lines v. Sun Valley Bus Lines, 70 Ariz. 65, 216 P.2d 404. In the first of those cases the court said: " 'No contractual consent, no statute of limitations, no laches nor estoppel can prevail against public policy, and any agreements made and any acts done in violation of it are necessarily void.' "

In that case the court held that a canal company, held to have a duty of distribution of water "similar to the principal duty of common carriers", did not cease to owe such duty through lapse of time, although it had long violated that duty without complaint by others or interference of the courts. In other words, once it became a public agency, it was always such. The rule applied in that case, and in the Greyhound cases which dealt with state regulated monopolies and the special interest of the public therein, has no proper application here where the rights involved are merely the private rights of two mining concerns.