In the Matter of JOHN STRACQUADANIO et al., Appellants, against DEPARTMENT OF HEALTH OF THE CITY OF NEW YORK, Respondent.

Argued January 8, 1941; decided March 6, 1941.

*Julius November* and *Edwin Stephen Schweig* for appellants.

*Herbert L. Maltinsky* and *Harry L. Marcus* for Associated Milk Dealers, *amicus curiæ.*

*William C. Chanler, Corporation Counsel (David I. Shivitz and Paxton Blair* of counsel), for respondent.

. Lᴇᴡɪs, J.  In a proceeding under article 78 of the Civil Practice Act we have granted leave to appeal and now review an order of the Appellate Division which unanimously affirmed an order of Special Term denying an application for a mandatory order directing the respondent Board of Health of the City of New York to issue to the appellant a " Class C permit " to deliver milk as an independent distributor.  (Sanitary Code of the City of New York, §§ 155, subd. 3, 156; Board of Health Regulation 3-a, subd. 3-b, par. 3.)

The petitioner-appellant asserts that the sections of the Sanitary Code and the Regulation cited above, which define the conditions under which a Class C permit may be issued, contravene the equal protection clauses of the Federal and State Constitutions and that refusal by the Board of Health to issue such a permit was capricious, arbitrary and in violation of those constitutional provisions.

Success in this proceeding, wherein the performance of an alleged official duty is sought to be enforced, requires of the appellant that he establish a clear legal right to the

remedy he has chosen. If the action by the Board of Health by which the appellant is aggrieved involved the exercise of a discretionary power, our inquiry is limited to a determination whether the record discloses circumstances which leave no possible scope for the reasonable exercise of that discretion in the manner of which the appellant complains. (*Matter of Durr* v. *Paragon Trading Corp.*, 270 N. Y. 464, 469; *Matter of Coombs* v. *Edwards*, 280 N. Y. 361, 363; *Matter of Schwab* v. *McElligott*, 282 N. Y. 182, 186; *Matter of Pruzan* v. *Valentine*, 282 N. Y. 498, 501.)

The Board of Health of the City of New York, in the performance of its statutory duty to protect and promote public health within the city, is authorized to promulgate rules and regulations as means to accomplish that end and, by appropriate provisions in the Sanitary Code, to exercise control and supervision over the delivery of milk and milk products to consumers. (New York City Charter, §§ 553, 556, 558, effective January 1, 1938.)

Permits for the distribution of milk are issued under section 155, subdivision 3, of the Sanitary Code and are divided into three classes as follows: *Class A*, are issued to dealers who operate pasteurizing plants in the city of New York; *Class B*, to dealers who operate milk depots; and *Class C*, to dealers who operate not more than one vehicle in the delivery of milk or milk products and who do not maintain a pasteurizing plant or milk depot but utilize the facilities of such a plant or depot located in the city and which is operated under a permit from the Board of Health.

The petitioner-appellant has been denied a Class C permit upon the ground that he failed to qualify within the requirements of regulation 3-a, subdivision 3-b (par. 3) promulgated by the Board of Health on July 27, 1939, under authority granted by section 558-f of the City Charter, which regulation provides that " The applicant must be a person of good character, of sufficient experience in the milk industry, *and have been a bona fide independent individual milk distributor in this city prior to June 1, 1939.*" (Emphasis supplied.)

Concededly the petitioner was not an independent milk distributor prior to June 1, 1939; nor has he owned or operated a pasteurizing plant or milk depot which would qualify him for either a Class A or Class B permit. (Sanitary Code, § 155, subd. 3.)

By this proceeding the petitioner, for himself and others similarly situated, invokes the Fourteenth Amendment of the Federal Constitution and section 11 of article 1 of the Constitution of the State of New York in support of his challenge to the validity of that part of the regulation last quoted above which requires of an applicant for a Class C permit that he shall be of sufficient experience in the milk industry, and shall have been a *bona fide* independent milk distributor in this city prior to June 1, 1939.

The challenge must be sustained unless it appears that any classification which the regulation may involve has a reasonable basis within the knowledge and experience of the official body by which it was promulgated. It is needless to labor the point, long settled, that we may declare such a regulation invalid only in the event that it is so lacking in reason for its promulgation that it is essentially arbitrary. (*Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78, 79; *Borden's Farm Products Co.* v. *Baldwin*, 293 U. S. 194, 209, 210; *Metropolitan Casualty Ins. Co.* v. *Brownell*, 294 U. S. 580, 584; *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152; *People* v. *Beakes Dairy Co.*, 222 N. Y. 416, 429.) If the regulation now challenged bears a reasonable relation to a *bona fide* purpose by the Board of Health to safeguard the milk supply of the city of New York as an incident to the protection and promotion of public health, then the promulgation of the regulation was a valid exercise of the Board's authority.

Clearly section 558 of the New York City Charter endows the Board of Health with a broad discretion in the selection of measures by which public health may be protected within the field of its jurisdiction. In determining whether there was a reasonable basis for the action of the Board in promulgating the regulation here in question, we give consideration

first to the rule in *Mayflower Farms, Inc.*, v. *Ten Eyck*
(297 U. S. 266), upon which the petitioner relies. In that
case the subject of review was a provision of the New
York Milk Control Act which differentiated between milk
dealers without trade names which had been broadly
advertised and who had entered the business prior to April
10, 1933, and those dealers in that class who had entered
the business at a later date. The act granted to the former
and denied to the latter the privilege of selling milk in
New York city at a price one cent below the minimum
which was binding upon dealers having well-advertised
trade names. The court held such a classification to be
discriminatory and in violation of the equal protection
clause of the Fourteenth Amendment of the Federal Consti-
tution. In doing so, however, the court was careful to
point out (p. 272) that " The record discloses no reason
for the discrimination. The report of the committee,
pursuant to which the Milk Control Act was adopted, is
silent on the subject." And again, at page 274 of the
opinion, we find a statement which clearly differentiates
the problem there involved from the one now before us.
" The appellees do not intimate that the classification
bears any relation to the public health or welfare generally;
that the provision will discourage monopoly; or that it
was aimed at any abuse, cognizable by law, in the milk
business." It is thus made clear that the factor which
was lacking in the *Mayflower* case (*supra*) as a basis of the
enactment there challenged, is present in the record at
hand in which the safeguarding of the city's supply of
milk — an essential item of diet — is established as the sole
ground for the regulation.

The distribution of milk is a business affected with a
public interest — a phrase which has been defined as
" * * * the equivalent of ' subject to the exercise of
the police power.' " '(*Nebbia* v. *New York*, 291 U. S. 502,
533.) It follows that he who enters the business of pro-
ducing, selling or distributing milk or its products, subjects
to regulation in the public interest not only those efforts

on his part which affect the quality of the product as it reaches the consumer, but also the property which he contributes to the enterprise. In the city of New York the density of population and many related conditions make the sanitary distribution of wholesale milk a major problem for the health authorities. Strict and constant vigilance in the supervision of such distribution is required. The difficulty of making inspections becomes apparent when we learn from the record that there are approximately eight thousand individuals distributing milk in the city of New York, of whom ninety-five per cent are employed by Class A or Class B licensees. For many years prior to 1939 the Board of Health restricted permits to deal in milk to those who operated pasteurizing plants or depots, at which places milk dealers and distributors gathered daily of necessity and thus made inspection and supervision of milk and milk products and the facilities for their storage and distribution a simpler matter for the city health authorities. Inspection and supervision under such an arrangement was successful until 1933 when the enactment of chapter 158 of the Laws of 1933 created the State Milk Control Board which, under statutory provisions, fixed the minimum price for the sale of milk. Then followed an amendment to the Sanitary Code of the city of New York by which loose fluid milk was eliminated from the New York city market. These two changes served to bring into the business of milk distribution within the city a large body of independent retail distributors which, in 1938, numbered about six hundred, all of whom operated without permits from either local or State authorities. As these independent distributors had no fixed places from which to conduct their daily operations, the problem of inspection and the enforcement of the Sanitary Code provisions relating to milk distribution became difficult. Finally, in 1938, a large number of unlicensed distributors united in a demand that the Board of Health grant them licenses. Responsive to this demand and recognizing that sound sanitary practice required the supervision of unlicensed distributors, the Board entered

upon a careful study as to the advisability of requiring permits for independent distributors.

Prior to its determination to enforce such a requirement and in its consideration of the requisite qualifications for such a permit the Board had the advantage of information bearing upon the problem possessed by its own members and gained from its employees and from data on file in the Department of Health. It also sought the views of experts in the field of public health and held public hearings to gain added information from individuals and from various groups which had manifested interest in the subject. From one or more of these sources it was learned that over a period of years certain unlicensed independent distributors, in an apparent effort to reduce the cost of the milk they delivered and thus to enable them to undersell their competitors, had indulged in various forms of unsanitary practice in the handling and delivery of milk and by various means had escaped inspection by authorized agents of the Health Department. It also appeared that if restrictive permits were not required of independent distributors their number might reasonably be expected to increase; that if their number should increase beyond the number then making retail deliveries, such increase would bring into the business of milk distribution more independent distributors than were required by the city's normal demand for milk. The resulting competition would make less likely strict adherence to the requirements of the Sanitary Code and departmental regulations and would make more difficult the enforcement of the sanitary rules designed to protect the purity of milk during its distribution. In connection with the evidence of adverse conditions likely to attend an increase in the number of unlicensed independent distributors above those then making deliveries, the Board of Health also gave consideration to the fact that in most instances the independent distributors, then unlicensed, had endeavored over a period of years to comply with the requirements of the health authorities and to that end had invested capital in facilities for cooling and delivering milk which were then available for use.

We regard these considerations, which influenced the Board of Health to promulgate the regulation here in question, as bearing a reasonable relation to an effort by the Board to safeguard the milk supply of the city of New York and thus to protect and promote public health. As a rational basis is thus afforded for the official action challenged by this proceeding, it follows that the order should be affirmed, with costs.

FINCH, J. (dissenting). We submit that the time limitation created by the words " since June 1, 1939," contained in the regulation has no relation to the public health and denies to the appellants the equal protection of the law guaranteed by the State and Federal Constitutions. Petitioners apply for a license permitting them to buy sealed bottled milk from approved milk dealers and resell the same to consumers. This application is denied upon the sole ground that under the regulation in question they have not been in the business prior to June 1, 1939. (Sanitary Code of City of New York, §§ 155, 156; Board of Health Regulation 3-a, subd. 3-b, par. 3.) Previous to July, 1939, the Sanitary Code of the city prohibited the sale of milk by one who did not possess a pasteurizing plant or depot. Despite this, many subdealers bought milk in sealed bottles from those having pasteurizing plants or depots and resold it in the same sealed bottles to customers. There were from six to eight hundred of these single individuals and a regulation was adopted permitting these illegal dealers to obtain a so-called Class C license if they had thus been doing business illegally prior to June 1, 1939.

Both the approved milk dealers engaged in the business of selling to these individual distributors and individuals situated as are petitioners, object that the regulation containing as it does a time limitation of June 1, 1939, unlawfully discriminates against them in favor of other milk dealers and individuals of the same class and that no valid reason exists for the inclusion of this arbitrary time limitation.

To sustain the regulation the city urges that if the time limitation is removed there will exist so many individual distributors that it will be impossible to make the proper inspections. This very objection but illustrates and emphasizes the arbitrariness and the unlawfulness of the discrimination which the time limitation creates. Without passing upon the validity of the contention that the mere difficulty of adopting a suitable and effective method of inspection is sufficient to curtail the liberties of those involved, no such issue has been here determined by the Board. Instead an arbitrary date has been selected.

Nothing has been shown in the case at bar which supports the contention that there is a reasonable relationship between the distribution of sealed milk and the public health or welfare which would afford a reasonable basis upon which the local authority could determine that during the life of this law no individual or corporation shall enter the milk business as a distributor in New York city. (*Mayflower Farms, Inc.*, v. *Ten Eyck*, 297 U. S. 266; *People* v. *Ringe*, 197 N. Y. 143; *Hauser* v. *North British and Mercantile Ins. Co.*, 206 N. Y. 455; *People* v. *Kuc*, 272 N. Y. 72; *People* v. *Cohen*, 272 N. Y. 319.) If the same principle is applied to other callings the liberty of the individual will cease to exist. We have here the same two elements which entered into the decision in the *Mayflower* case (*supra*), namely: (1) An absolute and arbitrary date set by the Commission, and (2) a discrimination in favor of those who had entered into the industry before that date. What is more, here we have an absolute denial of the right of any one else to enter into an industry which a chosen few are allowed to monopolize.

The case at bar does not fall within the category of cases where a regulatory law may be prospective in operation and may except from its sweep those presently engaged in the calling or activity to which it is directed. The absolute denial to petitioner of the right to engage in the distribution of milk which has been bottled, sealed and pasteurized at a Class A plant pursuant to Department of Health inspection

would seem to have no reasonable connection with public health and welfare. Nor does the power of the Board to consider the declared public policy of the State, including the burden resulting from the Workmen's Compensation Law (Cons. Laws, ch. 67) and social security laws, give to the Board power to deny petitioner his constitutional right to engage in a legitimate occupation upon the arbitrary ground that petitioner was not engaged in that business before an arbitrary date. To prescribe qualifications for entrance into a business or to prescribe regulations covering the different classes, is entirely different from proscribing the right to engage in such business altogether.

Other States have held invalid similar attempts to curtail individual liberty (*Alexander* v. *City of Elizabeth*, 56 N. J. L. 71; *Sheffield Farms Co.* v. *Seaman*, 114 N. J. L. 455; *Pabst Corp.* v. *City of Milwaukee*, 190 Wis. 349; *Whitney* v. *Watson*, 85 N. H. 238; *Northwestern National Ins. Co.* v. *Fishback*, 130 Wash. 490). The denial to petitioner of a right to a license merely because he had not been engaged in the milk business as an independent distributor before June 1, 1939, was arbitrary and discriminatory and fails to afford petitioner the equal protection of the laws guaranteed by the State and Federal Constitutions.

LEHMAN, Ch. J., LOUGHRAN and DESMOND, JJ., concur with LEWIS, J.; FINCH, J., dissents in opinion in which RIPPEY and CONWAY, JJ., concur.

Order affirmed.