In the Matter of EMANUEL L. STAMMER, Respondent, against THE BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK et al., Appellants.

Argued November 18, 1941; decided January 22, 1942.

*John J. Bennett, Jr.*, Attorney-General (*Bernard Bienstock* of counsel), for appellants. The finding that relator offered, undertook and agreed to cure and treat a disease by a secret method, procedure, treatment or medicine was sustained by sufficient legal evidence. (*Niagara Falls Power Co.* v. *Water Power & Control Comm.*, 267 N. Y. 265; *People ex rel. Freeborn & Co.* v. *Graves*, 257 App. Div. 587; *People ex rel. Bennett* v. *Laman*, 277 N. Y. 368; *Matter of Skinkle*, 221 App. Div. 682; *People ex rel. Doherty* v. *Martin*, 84 Hun, 64; 148 N. Y. 757; *People ex rel. Brown* v. *Green*, 106 App. Div. 230; 184 N. Y. 565; *Matter of Benjamin* v. *Rosenberg Bros.*, 180 App. Div. 234; 223 N. Y. 569; *People ex rel. Folk* v. *Bklyn. Board of Police*, 69 N. Y. 408; *People ex rel. County of Delaware* v. *State Tax Comm.*, 184 App. Div. 691; *People ex rel. Erie R. R. Co.* v. *Board of R. R. Comm.*, 54 App. Div. 615; *Boyd* v. *Boyd*, 252 N. Y. 422; *Jordan* v. *Alderson*, 48 Cal. App. 547.)

*Sidney Paymer* for respondent. The relator having revealed to the committee the formula used was not guilty of a violation of subdivision 2(d) of section 1264 of the

State Education Law (Cons. Laws, ch. 16). There is not sufficient legal evidence to sustain a finding that relator undertook to treat a patient with a secret medicine. (*Matter of New York Water Service Corp.* v. *Water Power & Control Comm.*, 257 App. Div. 590; *Matter of Skinkle*, 221 App. Div. 682.)

RIPPEY, J. Dr. Emanuel L. Stammer, petitioner-respondent, a physician and surgeon of some twenty years of active practice with an unblemished record, was disciplined by the Department of Education for violation of the provisions of section 1264, subdivisions 2(a) and (d) of the Education Law (Cons. Laws, ch. 16). In accordance with authorized procedure (Education Law, § 1265, subd. 5; Civil Practice Act, art. 78, § 1296), an order was made transferring proceedings for review of the findings and order which resulted in his suspension from practice and the cancellation of his certificate to the Appellate Division, third department. There an order was made reversing and annulling, on the law and the facts, the determination and order under review.

Procedure in a case like the present is governed by section 1265 of the Education Law. Upon a complaint and charges being filed, the Committee on Grievances of the Board of Regents refers the matter to a subcommittee who makes a preliminary investigation and later, if they feel the case warrants more attention, hold a formal hearing upon the charges; after the hearing the subcommittee makes findings and recommendations to the full Grievance Committee, who in turn, report to the Board of Regents, who make the final order.

The charges against respondent were made by one Violette Platt, a medical inspector in the Department of Education. She presented two charges, both of which were sustained, with all their accompanying specifications, by the Committee on Grievances and by the Board of Regents. He was charged, *first*, " with fraud and deceit in the practice of medicine in violation of Section 1264, subd. 2(a) of the Education Law," and, *second*, with " offer-

ing, undertaking and agreeing to cure and treat a disease by a secret method, procedure, treatment or medicine in violation of Section 1264, subd. 2(d) of the Education Law," both committed as follows:

" Between on or about the first day of October, 1938, up to and including about the first day of January, 1939, one James Blakeney, being unlicensed to practice medicine in the State of New York, and respondent did offer, undertake, promise, agree and guarantee to treat and cure one Rose Brower for the disease of cancer by means of a secret remedy and formula, and the said Blakeney and respondent did in fact treat the said Rose Brower for the said cancer by means of the alleged secret remedy and formula which they, the said Blakeney and respondent did assert that they possessed exclusively.

" (b) The representation, promise and guarantee of the said Blakeney and respondent that they would and could cure the said Rose Brower of her cancerous condition, was false, fraudulent and deceitful and was known by them to be false, fraudulent and deceitful in that there was and is no certainty as to the cure of cancer by any form of treatment.

" (c) The representations of the said Blakeney and respondent that they had a secret remedy and formula for the treatment and cure of cancer was false, fraudulent and deceitful and the said Rose Brower was induced thereby to engage the services of the said Blakeney and respondent.

" (d) The said Blakeney never has been and is not now licensed to practice medicine in the State of New York. Respondent's acts in permitting said Blakeney to treat the aforesaid cancerous condition by the alleged secret formula and remedy and by his association with the said Blakeney in the said treatment, did aid and abet the said Blakeney to unlawfully practice medicine. Respondent thereby held out the said Blakeney to the said Rose Brower as being able to treat a physical condition and disease by an alleged secret formula and remedy and thus misled and deceived the said Rose Brower."

The case is open to us to determine whether there was any sufficient legal evidence to sustain the findings and conclusions of the Board of Regents (Education Law, § 1265, subd. 5). The record of the hearing before the Subcommittee on Grievances disclosed the following:

Reportedly suffering desperately from an open, huge and foul-smelling cancerous growth on the side of her face and neck, beyond orthodox surgical and medical aid and given but a few weeks to live, volunteer social workers discovered impecunious Rose Brower and became interested in her case. She had been undergoing treatment at Queens General Hospital, was placed on the critical list and desperately ill and was finally discharged as beyond cure on August 31, 1938, but was advised to continue radiation theraphy at the clinic which she did. Medical records showed on September 22, 1938, that no benefit resulted from the treatment. A Mrs. Hendrickson had been taking her to and from the hospital at the times of clinical treatment. An interviewer at the hospital said that he knew a man who could positively cure cancer. Thereupon, after one of her treatments at the clinic and with the knowledge and consent of the interviewer and of the medical superintendent of the hospital and at the wish of Mrs. Brower, she was taken by Mrs. Hendrickson to Blakeney's home. At that interview Mrs. Brower and Mrs. Elcasser, wife of the hospital interviewer, at the interviewer's suggestion, were present. The respondent was not present. A Doctor Gilbert who was connected with the Queens General Hospital was supposed to be present but he was not there. Blakeney showed them photographs of cures he claimed to have effected on others, made various representations as to the efficacy of his treatment which was explained to consist of the application of a salve to the affected part to be changed each three hours for forty-eight hours when the roots would loosen from the normal tissue and the mass would drop off, but Blakeney refused personally to remove the bandage or undertake any treatment because Doctor Gilbert was not there. Blakeney told them he was not a physician.

On the following day, October 7, 1938, Blakeney was at the hospital and investigated the hospital charts and waited for Doctor Gilbert to arrive, but he did not appear. It was then decided to reach Doctor Stammer. Later, Mrs. Hendrickson and Blakeney found Doctor Stammer and the three went to Mrs. Brower's house. Shortly after their arrival, Doctor Gilbert and the interviewer arrived from the hospital. Again information was given that Blakeney was not a physician. At Doctor Stammer's request, the bandage was removed and Doctor Stammer examined the growth. The physician was told that the Browers were without means and said that he would like to help her if he could if her daughter-in-law would care for the dressings. Whereupon an appointment was made for him to visit her on the following day.

Thereafter respondent started to treat her with the salve, the daughter-in-law looking after the dressings. Doctor Stammer alone prepared and gave all treatment and gave all instructions for the care of Mrs. Brower. Although the salve was prepared for him by Blakeney, Doctor Stammer applied it and watched the results daily. Blakeney neither gave instructions nor participated in the treatments at any time. The patient and her relatives were told that the salve to be used was being prepared by Blakeney from his own formula and they consented to its use. At first the salve was applied every three hours and later each four hours. Mrs. Brower, the daughter-in-law, testified on February 27, 1940. She said: " As soon as we put this medicine on her it immediately cleaned up the odor. There was no more odor, there was no more discharge. Inasmuch as she had great pain it was nothing in comparison to what she had had before. As soon as this medication had taken place it seemed to have made her feel much better. * * * The ultimate result is the woman is living. * * * The growth has fallen out and scarred tissue is comparatively small now. She has gained twenty pounds, her general health inasmuch as she is not a young woman any longer, she is well, as well as can be expected. * * * There is

nothing there, just scarred tissue there now. * * * All healed up." After the ten-day treatment with the salve under the doctor's orders and supervision, olive oil was applied until January, 1939, when the cure was complete. All told, the doctor made some hundred visits, visited her daily when necessary and has since watched the case — all without asking or receiving any compensation for his services.

It appeared that Blakeney had disclosed the formula for the salve to Doctor Stammer with directions as to how to use it some years before the treatment of Mrs. Brower, that the doctor was familiar with all its ingredients, had tried it on healthy skin before he used it on Mrs. Brower and found no ill results. One, at least, of its ingredients was in general use in cancer treatment. On the preliminary investigation of the case before the subcommittee of the Grievance Committee, the doctor disclosed to them the ingredients of the salve and the details of his use of it and later divulged the formula as and when requested and furnished detailed description of treatment to the full committee.

However much latitude there may be in the handling and in the decisions of cases committed to other administrative tribunals, the Education Law (§ 1265, subd. 5) provides that the Committee on Grievances need not be bound by the laws of evidence in the conduct of its proceedings, but its determination must be founded upon sufficient legal evidence to sustain the same. Hearsay evidence alone does not meet the test. The evidence must be of probative character. A decision based upon evidence other than that required by the statute is arbitrary and baseless. There is no evidence that Doctor Stammer practiced fraud and deceit and that charge has been abandoned by the appellants upon this appeal. Reliance is placed only on the second charge which arises out of section 1264, subdivision 2(d), of the Education Law which provides, so far as material, that "The license or registration of a practitioner of medicine may be revoked, suspended or

annulled or such practitioner reprimanded or disciplined in accordance with the provisions and procedure of this article upon decision after due hearing in any of the following cases: * * * (d) That a physician offered, undertook or agreed to cure or treat disease by a secret method, procedure, treatment or medicine or that he can treat, operate and prescribe for any human condition by a method, means or procedure which he refuses to divulge upon demand to the committee on grievances." The commonly accepted and understood meaning of what is secret is that which is intentionally undisclosed or, as Webster puts it: " Something studiously concealed, a thing kept from general knowledge, what is not, or is not to be, revealed." The noun " secret " is similarly defined in the Century Dictionary. When used in a penal law, the word " secret " means " studiously concealed." (*Ferrell* v. *State*, 68 Tex. Crim. Rep. 487.) Generally, in law, a " secret " is something " kept from the knowledge or notice of persons liable to be affected by the act, transaction, deed or other thing spoken of " (Black's Law Dictionary; *Kaumagraph Co.* v. *Stampagraph Co.*, 235 N. Y. 1, 7). It is something intentionally and studiously concealed.

Within the commonly accepted meaning of the term " secret," and as used in the statute under consideration, we find no sufficient legal evidence in the case that the physician offered, undertook or agreed to cure or treat Rose Brower by any secret method, procedure, treatment or medicine. There was nothing secret about the medicine used or the method, treatment or procedure adopted. Indeed, the evidence is to the exact contrary. Neither did he studiously conceal the method, procedure or treatment which he adopted or the medicine which he used. Some years before he treated Rose Brower with the salve, Blakeney had divulged the formula to him and had explained to him the method of its use. There was evidence that Doctor Gilbert had previously attended cases where the formula and treatment had been used. Before undertaking treatment of Mrs. Brower the procedure and treat-

ment were fully explained. It was disclosed that a salve was to be used, the results to be expected were discussed, and consent of the patient and of her relatives to the use of the salve and to the treatment to be given were obtained. The mere fact that the details of the formula were not known to the patient or to some other particular person did not make it secret. The affirmative and uncontradicted evidence in the case is that Doctor Stammer had proposed to disclose to the medical society both the formula and treatment if it had merit and that he divulged upon demand to the Committee on Grievances the method, procedure and treatment adopted and used by him. The attempt to help Rose Brower by treatment outside of electro-theraphy was known to and approved by physicians connected with the hospital in whose clinic she was under treatment. The evidence is conclusive that respondent made no promise or representation that the treatment would cure the patient. Even had he done so, in the absence of fraud and deceit it would have been merely an expression of opinion and he would have committed no offense under the statute. If Blakeney at any time made any such representation, it was not made in the presence of Doctor Stammer or with his knowledge and any evidence thereof that appears in the record is not the legal evidence required by the statute or binding upon the doctor. It is quite immaterial that Blakeney did not disclose the formula and treatment to the Committee on Grievances previous to the formal hearing in this case even though such had been the fact. There is no evidence that he refused to divulge it to them or that they ever demanded it of him. The statute imposed no duty on him to make such disclosure in any event. Blakeney was not on trial. He was not a physician subject to discipline under the statute. He died before the trial of Doctor Stammer commenced and it was beyond the power of the doctor to show upon the hearing, though there was no legal requirement that he should do so, that the formula and treatment had not been disclosed generally by Blakeney during his lifetime to others.

By every test set by the Legislature, respondent committed no act condemned by the statute for which discipline could be imposed.

The order appealed from should be affirmed, with costs.

LEWIS, J. (dissenting). The Board of Regents is the agency designated by the Legislature to supervise the licensing of physicians in this State. (Education Law, § 51.) When the Board suspended for one year the license granted to the respondent, after a hearing held pursuant to section 1265 of the Education Law, its action was in the exercise of an administrative discretion. (Education Law, §§ 1264, subd. 2 [d], 1265 and 1266.) Accordingly, in the present proceeding under article 78 of the Civil Practice Act, we are to determine whether the record discloses circumstances which left any possible scope for the reasonable exercise of that discretion in the manner which led to the Board's order of suspension. (*Matter of Durr* v. *Paragon Trading Corp.*, 270 N. Y. 464, 469; *Matter of Stracquadanio* v. *Dept. of Health*, 285 N. Y. 93, 96.) In pursuing the inquiry I have in mind the ruling by this court that " The regulation of the practice of medicine is undertaken by the State not for the protection of the physicians themselves, but for the protection and welfare of the people. ' The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud.' " (*People ex rel. Bennett* v. *Laman*, 277 N. Y. 368, 374, 375; *Dent* v. *West Virginia*, 129 U. S. 114, 122.)

The respondent was suspended by the Board of Regents which sustained a finding by its Medical Committee on Grievances that he was guilty of the charge made under section 1264, subdivision 2(d), of the Education Law that he " * * * offered, undertook or agreed to cure or treat disease by a secret method, procedure, treatment or medicine * * *."

In October, 1938, a woman — to whom I shall refer as "the patient"— was attending a clinic at Queens General Hospital for treatment of a facial growth which had been diagnosed as a cancer. In the course of such treatments she was induced by persons not connected with the hospital to consult a man who was introduced to her as "Doctor Blakeney" and who, concededly, was not licensed to practice medicine. Noting that the patient's face was bandaged, Blakeney told her he would not remove the bandage unless a doctor was present. He did, however, make a superficial examination of the afflicted portion of the patient's face after which, it is said, he advised her that "he positively could cure it." He stated that the treatment would involve the application every three hours of a salve which would loosen the roots of the diseased mass and would separate it from the normal tissue. There is also testimony that when one of the persons present in the room suggested to Blakeney, "If you have this cure don't you think you are in duty bound to give it to the Medical Society?" Blakeney replied, "No, not as long as I live, and when I die I will take it to my grave."

Three years prior to that time Blakeney had told his friend Doctor Stammer — the respondent upon this appeal — that he had a salve which had been "left to him by a relation" which was used in the treatment of cancer. Blakeney had never used the salve himself although there is proof that he exhibited photographs of persons upon whom the salve had been used.

On October 7, 1938, the respondent went to the patient's home accompanied by Blakeney. After examining the patient the respondent said: "Before I touch this case I want to know whether you are going to continue with the clinic." Upon receiving her assurance that she would not return to the clinic, the respondent stated: "Once I start the case I want you to be through with Queens General Hospital for good unless my treatment fails." Meantime the respondent had been told by the patient's daughter-in-law that the patient would die within three weeks. When

questioned upon the hearing what he said to the daughter-in-law the respondent replied: "I didn't tell her anything except that I have a formula or a salve that is used for skin cancer. * * * I told her I was willing to use it, to try it out, I had never used it before, if it worked it would be all right, but I never used it previously, we will try it, there is nothing to lose, she is going to die in three weeks and if it benefited, well and good."

The first treatment, when the salve was applied by the respondent, was on the following day, October 8, 1938, and thereafter, in accord with directions given by the respondent, fresh applications of the salve were made every three hours for seventy-two hours. On January 5, 1939, word came to the respondent from the patient that "the tumor mass had fallen out." Since that time healing has taken place and there remains only a scar at the point where formerly there existed the growth diagnosed as a cancer.

The respondent admits that when he started to treat the patient by applying the salve he was not sure of its merit. The record shows that aside from being told by Blakeney that a relative had "left it to him" the respondent had no personal knowledge concerning the salve except that it was a "brownish color." Five pounds of the salve — which was contained in jars which bore no labels — were used in treating the patient, all of which was supplied by Blakeney who prepared it at a place and under conditions unknown to the respondent. Although the respondent admits that Blakeney knew nothing about skin cancer, the respondent applied the salve to the diseased mass upon the patient's face without consultation with a chemist, a pharmacist or another doctor to determine by analysis whether the salve contained ingredients which had therapeutic value and were appropriate for the treatment of cancer. In that connection the respondent stated that before he started the treatments, the only "clinical experiment" made by him was when "I tried it on myself," his comment at the hearing being, "As long as it didn't injure healthy skin it certainly had no ill effect on unhealthy skin."

Blakeney did inform the respondent that the salve contained four ingredients apportioned as follows: zinc sulphate, five per cent; a Chinese spice known as galanga, twenty per cent; sanguinaria, fifty per cent and lanolin, twenty-five per cent. The respondent knew nothing about the ingredients except that zinc sulphate " is used in the treatment of cancer, as an escharotic." As to the use, in the treatment of cancer, of a Chinese spice known as galanga — which according to the formula, composed twenty per cent of the salve — he had never heard of it. In short, except for the statement made to him by Blakeney — who was not proved to have expert knowledge — the record fails to show that the respondent had any information as to the curative properties of the ingredients, except the zinc sulphate, and he denied knowledge whether in the preparation of the salve Blakeney had adhered exactly to the proportions stated in the formula.

I have referred to Blakeney's statement that he would not divulge the formula during his lifetime. It appears however, as we have seen, that he did inform the respondent of the formula, and that he prepared and furnished to the respondent the salve which was applied in the treatments given to the patient. The respondent concedes that at the time he started to treat the patient it was his intention to keep secret the salve until he proved its value. When asked upon the hearing before the Medical Grievance Committee the direct question whether he and Blakeney considered the formula a secret between themselves, his answer was: " I don't know whether it was a secret or not. I wouldn't say yes and I wouldn't say no." There is no evidence that Blakeney, now deceased, ever divulged the formula except to the respondent. As to whether the respondent himself kept the formula as a secret, I find that when the respondent was asked upon the hearing, " Have you divulged that formula to anybody except the Medical Grievance Committee to date? " he replied, " I didn't divulge it to anybody except the Committee."

I construe subdivision 2 (d) of section 1264 of the Education Law as authorizing disciplinary action by the Board of Regents whenever, under procedure prescribed by section 1265, it is determined that a physician (1) " * * * offered, undertook or agreed to cure or treat disease by a secret method, procedure, treatment or medicine * * *;" or (2) that he " * * * offered, undertook or agreed * * * that he can treat, operate and prescribe for any human condition by a method, means or procedure which he refuses to divulge upon demand to the committee on grievances," or (3) " that he has advertised for patronage by means of handbills * * *," etc.

In my opinion the facts before us constitute evidence that the respondent " * * * undertook * * * to * * * treat disease by a secret ⁴ * * * medicine * * *" — within the provisions of section 1264, subdivision 2(d), *supra*. That evidence affords a basis sufficient for the disciplinary action taken by the Board of Regents which is the subject of the respondent's challenge in this proceeding.

If, as I believe, there is in the record at hand evidence which warrants the exercise by the Board of Regents of administrative discretion within the field defined by the statutes cited, the purpose of the Legislature has been accomplished in this instance. " Those seeking medical attention have no means of estimating the skill and ability of the physician, and must depend upon the State to permit only those qualified to engage in that profession." (*People ex rel. Bennett* v. *Laman, supra,* p. 375.)

I vote for a reversal of the order of the Appellate Division and the reinstatement of the disciplinary order of the Board of Regents.

LEHMAN, Ch. J., LOUGHRAN, FINCH and DESMOND, JJ., concur with RIPPEY, J.; LEWIS, J., dissents in opinion, in which CONWAY, J., concurs.

Order affirmed.