[Civil No. 4468. Filed April 6, 1942.]

[124 Pac. (2d) 324.]

DAILY MINES COMPANY, a Corporation, Appellant, v. CONTROL MINES, INC., a Corporation; and HAZEL WILSON DAILY, as Administratrix of the Estate of W. H. Daily, Deceased, HAZEL WILSON DAILY, Individually, J. EDGAR ATKINS, DR. H. G. BONNELL and FRANCIS M. HARTMAN, Interveners, Appellees.

Mr. Tom K. Richey, and Messrs. Baker & Whitney, for Appellant.

Mr. Francis M. Hartman, for Appellees.

LOCKWOOD, C, J.—This is an action in forcible detainer by Daily Mines Company, a corporation, plaintiff, against Control Mines, Inc., a corporation, defendant, and others. Judgment of not guilty was rendered, and after the usual preliminary steps, this appeal was taken.

It is apparently agreed by plaintiff and defendant that the real question for our decision is whether there is legal evidence to sustain the finding of the trial court that defendant did comply with the terms of the lease under which it held possession of certain mining property belonging to plaintiff. In passing upon the appeal, there are certain principles of law governing our consideration thereof, which cannot be disputed: (a) If there is reasonable evidence to support the findings of fact of the trial court, they will be sustained by this court. *Glaspie* v. *Williams,* 46 Ariz. 381, 51 Pac. (2d) 254. (b) If there is sufficient legal and competent evidence to support such findings, the erroneous admission of other evidence by the trial court will not justify a reversal of the case. *First Baptist Church* v. *Connor,* 30 Ariz. 234, 245 Pac. 932; *Glaspie* v. *Williams, supra.* (c) If different inferences as to the ultimate facts may be drawn from evidentiary facts, we must accept the inference drawn by the trial court. *First National Bank* v. *Osborne,* 39 Ariz. 107, 4 Pac. (2d) 384.

In September, 1939, plaintiff leased certain mining properties to one R. A. Burney. This lease contained, among other things, the following provisions:

(a) "Lessee shall furnish a proper and suitable mill for the proper treatment of the ores from said claims and shall have the same in operation and milling said ore on or before the 1st day of January, 1940, and shall thereafter properly mill and treat at least 1,000 tons of ore from said claims each month during the life of this lease; *Provided, however,* that if, with

proper and continuous mining on said claims, Lessee shall be unable to extract 1,000 tons of ore from said claims, in any month during the life of this lease, that then and in that event, Lessee shall mill and treat all ores extracted from said claims in such month and shall diligently and continuously prosecute development work on said claims to bring production of ores from said claims to the said minimum of 1,000 tons per month for milling and treatment as provided herein; and *Provided further,* that if the price of copper shall fall to nine cents or less per pound during the life of this lease, Lessee shall have the privilege of suspending mining and milling operations under this lease, without however, forfeiting or abandoning the same, and upon the restoration of the price of copper to more than nine cents per pound, Lessee shall resume mining and milling operations hereunder and carry same on as before the exercise of said privilege.

" . . . . . . . . . . .

(b) "Lessee may at once enter upon and take possession of said claims for the purposes herein defined, and beginning with the month of November, 1939, shall do and perform at least one hundred shifts of development and mining work and labor on said claims each month during the life of this Lease, except as herein otherwise provided, and in doing and performing said work and labor Lessee shall keep the development work ahead of production.

(c) "All work done on said claims by Lessee shall be done in a good, substantial, minerlike manner, timbering and ventilating where good mining calls for same, impounding and preserving the tailings from said mill operations and the placing and piling of debris, rock, dirt and refuse resultant from the extraction and seeking for ores shall be done in a proper and minerlike manner, with a view to future convenience and economy in carrying on the mining and development of said properties.

" . . . . . . . . . . .

(d) "Lessee shall keep accurate reports, assay sheets, maps and plats of underground workings, logs of diamond drill operations, including assay maps thereof, recommendations and suggestions of en-

gineers and computations of dimensions and possible tonnage of ore bodies discovered or developed, and shall furnish Lessor with a correct copy of same each month as operations progress under this Lease.

". . . . . . . . . . . .

(e) "Should Lessee fail to do any of the things herein specified to be done by Lessee at the time and place herein mentioned, Lessor may declare this Lease at an end and recover possession as if said premises were held by forcible detainer."

This lease was later assigned to defendant herein. On September 19, 1940, plaintiff served the following notice on defendant:

"Tucson, Arizona, September 19, 1940.

"Control Mines, Inc.,

"Oracle, Arizona.

"Gentlemen:

"You are hereby notified that the undersigned Daily Mines Company, elects to do and does hereby declare at an end that certain lease and indenture made on September 25th, 1939, between Daily Mines Company, party of the first part, therein called Lessor, and R. A. Burney, party of the second part, therein called Lessee; the interest of the said R. A. Burney in said lease and indenture having been assigned to Control Mines, Inc. under date of October 30th, 1939. The aforesaid action on the part of and by Daily Mines Company is taken under authority of that certain paragraph appearing on page 5 of said lease and indenture and which said paragraph reads as follows:—(quoting par. (e) of lease).

"This action is taken for the reason that you have failed, neglected and refused to do and perform the following things specified in said lease and indenture to be done and performed by you:—(setting forth the substance of paragraphs (a), (b), (c) and (d) of lease).

"You are hereby required to cease all operations on the properties and claims covered by or described in said lease, whether mining, milling or other operations, and to vacate all of said properties at once, and demand is hereby made that you deliver possession

of said properties to Daily Mines Company, a corporation, on or before ten days from the date of the service of this notice and demand for possession.

"Yours very truly,
"Daily Mines Company
"By J. W. Daily, President."

to which defendant promptly answered on September 24th, as follows:

"The Control Mines, Inc., has complied and is now complying fully and completely with all the terms and conditions of that certain lease and option contract made and entered into September 25th, 1939, between Daily Mines Company, as party of the first part, and R. A. Burney, as party of the second part.

"The Control Mines, Inc., will not cease operations on the properties and claims covered by said lease and option contract.

"The Control Mines, Inc., will not vacate said properties, and will not deliver possession of said properties to Daily Mines Company."

On October 15 this suit was commenced. After considerable delay, which apparently was acquiesced in by both parties, the case was tried before the court without a jury, and judgment was rendered of not guilty. After considerable discussion and delay, the court filed findings of fact, which held that defendant did not violate the terms of its lease. These findings are as follows:

"1. (a) The defendant, Control Mines, Inc., from November, 1939, to September 30, 1940, mined and milled from the Daily Mine, over 15,000 tons of ore which yielded a grade of less than 2% copper, not high enough to yield a profit.

"(b) The defendant, Control Mines, Inc., was unable, with proper and continuous mining on said Daily Mine, to extract 1,000 tons of ore therefrom, for each of the months of May, June, July, August and September, 1940; but did, during each of said months, mill and treat all ores extracted from said mine; and did,

during each of said months diligently and continuously prosecute development work on said mine.

"(c) From February to September, inclusive, 1940, the price of copper as paid for by the smelter, was less than nine cents per pound.

"2. Defendant, Control Mines, Inc., during each of the months of November and December, 1939, January, February, March, April, May, June, July, August and September, 1940, performed at least one hundred shifts of development and mining work and labor on said mine; and in doing and performing said work and labor kept the development work ahead of production.

"3. All work done on said mine by defendant, Control Mines, Inc., was done in a good, substantial, minerlike manner.

"4. (a) Defendant, Control Mines, Inc., kept accurate reports and assays of all ore mined, milled and marketed, from said mine, and furnished plaintiff with correct copies of same each month.

"(b) John W. Daily, President and General Manager of plaintiff, Daily Mines Company, visited said properties and examined the underground workings of said mine approximately twice each month from January to September, 1940, and was invited and requested by defendant, on said visits, to examine and inspect all of its books and records.

"5. That plaintiff, Daily Mines Company, received, accepted and retained, royalties, from defendant Control Mines, Inc., under said lease, subsequent to September 19, 1940, as follows:

| | | | |
|---|---|---|---|
| September | .. | 1940 | $ 31.05 |
| October | 10, | 1940 | 31.61 |
| October | 19, | 1940 | 139.34 |
| November | .. | 1940 | 102.57 |
| November | 29, | 1940 | 153.04 |
| December | 17, | 1940 | 107.84 |

$565.45

"6. That *Article* IV of the By-Laws of the Daily Mines Company, a corporation, provides as follows:

"*Article* IV

"*Power of Directors.*

"The Directors shall have the power:

"1st. To call special meetings of the stockholders when they deem it necessary, and they shall call a meeting at any time upon the written request of stockholders having one-third of all the capital stock outstanding.

"2nd. To appoint and remove at pleasure all officers, agents and employees of the corporation, and to require from them security for faithful service.

"3rd. To conduct, manage and control the affairs of the corporation and to make rules and regulations not inconsistent with the laws of the State of Arizona, or the Articles of Incorporation or the By-Laws of the corporation, for guidance of the officers and the management of the affairs of the corporation.

"4th. To authorize and ratify all contracts with the assent of a majority of the outstanding stock of the company, to bond, lease, sell, grant and convey any and all of the property of this corporation and any and all property that it may hereafter become seized of, and to grant options on the same.

"7. That the purported declaration of forfeiture of said lease, of September 19, 1940, was not authorized, assented to, or consented to by the holders of a majority of the outstanding stock of the Daily Mines Company."

It is apparent from the foregoing that plaintiff attempted to declare the lease in question forfeited on account of the failure of defendant to do four things which are set forth in the notice of forfeiture. If it is required by the lease that these things be done, and if it appears that they were not done, plaintiff had the right to declare it forfeited and to recover possession in this action.

■ There is a difference of opinion as to the meaning of some of the provisions of the lease. This, of course, is a question of law to be determined by this court, as we are not bound by the findings of the trial

court on questions of law. *Maricopa County Mun. W. Conservation Dist.* v. *Southwest Cotton Co.*, 39 Ariz. 65, 4 Pac. (2d) 369.

 The first provision of the lease involved is in regard to the amount of ore to be mined. While the lease provides for the mining and milling of 1,000 tons of ore per month, there is an exception to the effect that if this amount cannot be extracted with "proper and continuous mining" all that is required is that the lessee shall mill and treat all of the ore that can be reasonably extracted and continue development work with reasonable diligence so as, if possible, to increase the production to the required 1,000 tons per month, and that if copper drops below nine cents per pound, that mining and milling operations may be suspended, except as provided later in the lease.

We think the evidence is ample to sustain a finding that the condition of the mine was such that it was not possible, with proper and continuous mining, to extract the required amount of ore monthly all through the lease, and that the lessee did properly mill and treat all ores which it extracted from the claims during the life of the lease.

We think also that there is evidence to show that it did "diligently and continuously prosecute development work" on the property during all the time of the lease, so far as was reasonably possible under all the circumstances.

 The second question is as to the interpretation and performance of the clause of the lease regarding the doing of "one hundred shifts of development and mining work and labor" each month. It is the contention of plaintiff that this required one hundred shifts to be devoted to development work alone. It is the position of defendant that it required one hundred shifts of development and mining work and labor taken together.

We think it is clear that the provision refers to the total amount of development and mining work combined, and not to development work alone. There is sufficient evidence in the record to sustain the finding that the defendant did perform more than the required one hundred shifts of work per month during the life of the lease. It is urged, however, that the evidence does not show that development work was kept ahead of production, in that it appeared when the notice of forfeiture was given there was less ore in sight suitable for mining than there was when the lease commenced.

■■ Of course the meaning of the several provisions of the terms of a document must be determined by reading the instrument as a whole, and not by construing the different sections thereof separately. Clauses of this kind in mining leases are obviously inserted for the purpose of preventing the lessee from looting the mine of all developed ore without making the proper effort to seek for more, so that the mine may be kept in continuous production. If clauses of this kind are to be construed as meaning that sufficient development work must be done so that at all times there will be at least as much ore developed in the mine as there was at the beginning of the lease, it would mean that only the amount of new ore developed could be mined and that in many cases a continuous process of extracting and milling ore could not be maintained.

We cannot conceive that this is the meaning of the clause referred to. Taking into consideration the other requirements of the lease in regard to mining and milling 1,000 tons per month, we think rather that it means a reasonable amount of dead work must be maintained, consistent with the conditions obtaining in the mine, in an endeavor to find new ore.

With this interpretation we think there was sufficient evidence to justify the court in finding that defendant did comply with the terms of the lease in regard to keeping development ahead of production. The evidence also shows that the work of handling the debris, rock and refuse, and generally all of the work done by the defendant upon the property was done in a good, substantial and minerlike manner.

The evidence does not show, in our opinion, that defendant furnished plaintiff with a correct copy of its "reports, assay sheets, maps and plats of underground workings" etc., as set forth in the lease. It did, however, exhibit all of its records to the president of plaintiff, on his semi-monthly visits to the property, and assisted him in every manner to ascertain just what the condition and progress of all the work was. While this was not a literal compliance with the terms of the lease, it was substantially so.

It is unnecessary for us to discuss and set forth in this opinion the voluminous evidentiary facts which sustain the ultimate findings of the trial court, as it would be of no value as a precedent in future cases. It is sufficient to say that there is, in our opinion, enough legal and competent evidence to sustain the findings of the trial court that defendant did not breach the conditions of the lease, so as to permit plaintiff to declare it forfeited and recover possession of the property.

There are two other questions raised in the appeal, whether the acceptance of royalties, after the notice of forfeiture, was a waiver by plaintiff of the forfeiture, if any, and whether, under the provisions of the articles of incorporation of plaintiff, the board of directors was required to have the assent of a majority of the stockholders to declare the lease forfeited. We think, however, that since the court found the condi-

tions of the lease had not been breached, it is not necessary for us to pass on these matters.

The judgment is affirmed.

McALISTER and ROSS, JJ., concur.