412 P.2d 47

**TOVREA LAND AND CATTLE COMPANY, an Arizona corporation, et al., Appellants and Cross-Appellees,**

**v.**

**Otto H. LINSENMEYER et al., Appellees and Cross-Appellants.**

**No. 7589.**

Supreme Court of Arizona.

In Banc.

March 11, 1966.

Rehearing Denied May 17, 1966.

112

Evans, Kitchel & Jenckes, Phoenix, and Norman S. Hull, Tucson, for appellants and cross-appellees.

Otto H. Linsenmeyer, and Lawrence H. Doyle, Jr., Phoenix, for appellées and cross-appellants.

BERNSTEIN, Vice Chief Justice.

The individual appellants-cross appellees, hereinafter called defendants, appeal from a judgment of the Superior Court of Maricopa County entered December 18, 1961 in favor of appellees-cross appellants hereinafter called plaintiffs.

Plaintiffs, minority stockholders of Tovrea Land and Cattle Company, an Arizona corporation, filed a complaint against the corporation and these defendants as the directors thereof, on March 24, 1958. Plaintiffs charged defendants with breach of fiduciary duty, mismanagement, and ultra vires acts since 1946, and asserted that such alleged conduct was pursuant to a conspiracy among those defendants who were directors in 1946, in which those defendants who became directors thereafter joined. The gist of these charges is (1) that defendants allowed the corporation to purchase nineteen oil tankers from the United States, on May 17, 1946 in an ultra vires purchase which resulted in so depleting capital funds that a sale of the Company's major asset, a packinghouse, was forced in the spring of 1947, (2) that defendants used corporate assets to engage in business competition with the corporation, (3) received bonuses as employees to which they were not entitled be-cause of their mismanagement, (4) purchased stock of the corporation to gain control of the business, and (5) approved sales of assets to defendants P. E. Tovrea, Sr. and E. A. Tovrea during liquidation of the corporation on December 1, 1958, at prices and terms more favorable than had been advertised for sale.

After a lengthy trial the court made and entered findings of fact, on February 24, 1961, which were later incorporated in the judgment. In these findings, the court found that defendants used corporate assets in businesses in competition with the corporation and in ultra vires transactions, the purchase of the tankers should have been authorized by the stockholders, and the Tovreas should account for amounts equal to 5% of the purchase price of personalty which they acquired together with real property purchased during liquidation. The trial court found that it was necessary that a master be appointed to take testimony to ascertain the amount of the judgment to which plaintiffs were entitled.

A detailed statement of facts will be presented in connection with each argument of the assignments of error. The foregoing is a general outline of the nature of the action and the following is a brief sketch of the case. Plaintiffs called defendants as witnesses under Rule 43(g), Rules of Civil Procedure, 16 A.R.S., and defendants relied upon such testimony and did not call any witnesses.

**114**

Most of the trial court's findings are mixed questions of law and fact or are legal conclusions which we are free to evaluate unrestricted by the rule compelling us to construe the evidence most favorably to support the judgment. In United States Smelting etc. Co. v. Wallapai M. & D. Co., 27 Ariz. 126, 230 P. 1109 this court said it was not bound by a jury verdict where the question was not the truth or weight of the evidence but its effect. This means that if the facts are undisputed, we may ignore the trial court's findings and substitute our own analysis of the record. This principle applies whether the record consists of pleadings, documents, affidavits and stipulations, Combustion Engineering v. Arizona State Tax Com'n., 91 Ariz. 253, 371 P.2d 879, or the testimony of parties and witnesses. Sanders v. Brown, 73 Ariz. 116, 238 P.2d 941.

We are not bound by the conclusions of law made by the trial court, Wilkinson v. Takesuye, 66 Ariz. 205, 185 P.2d 778; Daily Mines Co. v. Control Mines, Inc., 59 Ariz. 138, 124 P.2d 324. In Cantlay & Tanzola, Inc. v. Senner, 92 Ariz. 63, 373 P.2d 370 this court said it would review all evidence and inferences most favorably to support the trial court's findings and judgment and will not disturb that judgment if supported by substantial evidence, but we are not bound by the conclusions of law of the trial court as applied to those findings of fact. See also Arizona State Board of Medical Examiners v. Clark, 97 Ariz. 205, 398 P.2d 908; DeSantis v. Dixon, 72 Ariz. 345, 236 P.2d 38, 44 A.L.R.2d 513. Certain parties will be designated as follows: Tovrea Land and Cattle Company as Tovrea Company, P. E. Tovrea, Sr. as Tovrea; P. E. Tovrea, Jr. as Phil; E. A. Tovrea as Ed; and various other persons and ventures will be mentioned in abbreviated designations.

Tovrea Company was incorporated as Arizona Packing Company in 1929 by Tovrea's father. By amendment of its articles of incorporation, adopted February 1, 1937, it possessed extremely broad powers, including the power to lend money and deal in all kinds of property. Tovrea became its president in 1932, and he continued as president until his death in 1962. As president he was authorized by the corporation to be in general charge of the business, and had power to bind the company by contract. He and his family owned approximately 75% of the capital stock. The members of its board of directors have changed from time to time. Of defendant directors, Haldiman served during the years 1948 to 1953, and Wambach served from 1955. Plaintiff Ernest J. Linsenmeyer was a director in 1954, and defendant Wambach succeeded him as the representative of the interests of the Linsenmeyer family and the testamentary trust

of which the Linsenmeyers were the beneficiaries which amounted to approximately 10% of the outstanding stock. Defendants Ed and Phil resigned as directors on November 28, 1958, and they were succeeded on the board by Wayne M. Aiken and Marshall C. Christy.

Tovrea Company's primary business activity prior to 1947 was operating a meat packinghouse which was sold that year. Thereafter, the Tovrea Company primarily conducted a custom feeding operation described in detail below. The oil tankers were purchased in 1946 which plaintiffs allege so depleted Tovrea Company's assets as to force a sale of the packinghouse to satisfy the indebtedness. We will now consider the facts relating to each argument.

The defendants' thirteen assignments of error will be dealt with to correspond with their six arguments. The first argument challenges the trial court's finding that the defendant directors organized, controlled and operated certain businesses, named below, solely for their personal benefit and in direct competition with Tovrea Company thereby violating their fiduciary duty owing to the company. The court also found that the defendants used Tovrea Company assets to conduct their personal businesses. In addition, the trial court found that the defendants secured secret profits "pursuant to a scheme and design * * * through their willful, fraudulent, and ultra vires acts, and mismanagement,

and breach of fiduciary relationship, * * * resulting in ultimate damage and loss to the stockholders of the corporation."

█ Fraud must be established by clear and convincing evidence. Dunahay v. Struzik, 96 Ariz. 246, 393 P.2d 930. The uncontradicted testimony shows the following facts. From the time of incorporation until 1947, the principal business of Tovrea Company was operating a packinghouse and buying and selling cattle. Other business operations included a farm and hardware store, lumberyard and fertilizer plant. The Tovrea Company also operated five breeding herd ranches in New Mexico with a total of about 350,000 acres. After sale of the packinghouse in 1947 the custom feeding operation, theretofore a small part of the business, was expanded and became the Tovrea Company's primary business activity. Cattle owned by people in the feeding business, traders and ranchers came by truck and rail to Tovrea Company pens. The pens handled about 40,000 to 60,000 cattle annually for custom feeding. The average stay was 90 to 150 days and the cattle were fed special rations from the mixing mill including ground hay, grain, cottonseed meal and hulls, molasses and biotics. Complete records on weight and the amount of feed consumed were kept on each owner's cattle which were segregated. When they left the pens they were ready for slaughter. The pens were also used for

approximately 150,000 to 200,000 transient cattle annually which stayed from 1 to 21 days to rest, feed and be offered for sale. Tovrea Company offered some customers the service of buying, feeding, selling and financing cattle.

The capacity of the custom feeding pens was 25,000 and it required 10,000 cattle in the pens for Tovrea Company to break even. The uncontradicted evidence further shows that under Tovrea Company policy, if and when the number of cattle in the yards was too small to achieve a break-even basis, Tovrea Company bought cattle to that extent and would also buy if the market was firm and there was a prospect of a good profit. But the purchase, fattening and sale of cattle was not regarded as a safe and conservative investment for Tovrea Company. It was too speculative because of market fluctuations which caused variations from $10 to $100 a head market value within a six month period. Fattened cattle could not be held for a higher market price because the cost per pound of gain was too high.

Tovrea Company also loaned surplus funds on interest to Tovrea, Ed, Marley, Gro-Gren, Agricultural Products, BarVee, the Maybes, T&C, General Farms and Tovrea Equipment. The companies mentioned were owned and operated by the individual defendants and will be discussed below. There is no evidence of loans to Barnard, Evans and Wambach. The record shows that all loans were repaid in full with interest.

When Tovrea became president in 1932, Tovrea Company was carrying open accounts for officers and other employees, but not directors, which policy Tovrea continued. The officers would deposit and withdraw funds without collecting or paying interest on the resulting debit or credit balances. The practice was controlled because each officer's draw had to be approved by another officer with the exception of Tovrea. The officers' accounts were cleared and balances struck annually. Tovrea distinguished other accounts on which interest was not charged as current accounts with 96, Agricultural Products, T&C, the Maybes and BarVee stating that the annual balance rule did not apply because the transactions between Tovrea Company and these companies were continuous. All of the businesses dealing in cattle paid their feed bills to Tovrea Company on a regular 30-day basis or interest was charged.

The trial court found that the individual defendants operated the following businesses for their sole profit and in competition with Tovrea Company. The Bar-Vee was a partnership from 1954–57 among Tovrea, Ed, Phil, Evans, Marley, Barnard and others. Tovrea testified that BarVee was formed to create a customer for Tovrea Company custom feeding pens. The primary operation of BarVee was

buying, feeding and selling cattle but it was not a custom feeding outfit. It was in the same business as Tovrea Company only to the extent of Tovrea Company's occasional cattle buying operation to reach the 10,000 break-even point. BarVee fed about 6,000 cattle annually in Tovrea Company pens and was carried on a 30-day feed bill basis like everyone else. Tovrea Company also charged BarVee $1.00 per head for buying, selling and keeping its account which charge was not common practice in the business and was above that charged to feed cattle owned by others. Barnard said he kept books for BarVee as part of the $1.00 per head charge. Tovrea Company made over $300,000 feeding cattle of BarVee, Maybe and 96.

Defendant Tovrea loaned money to Tovrea Company at 4% and Tovrea Company loaned it to BarVee at 5%. Tovrea authorized loans to BarVee in violation of a 1947 resolution prohibiting loans, without a majority vote of Tovrea Company directors, to corporations in which Tovrea Company directors or officers had stock. The evidence shows there was no damage suffered by Tovrea Company and the record further shows that Tovrea Company made a substantial profit. At the time of the adoption of the 1947 resolution there was presented a resolution which would have changed Tovrea Company's long established practice of making personal loans to directors without majority approval of the board of directors. The resolution failed. The stockholders subsequently ratified all official acts of the board of directors and the practice of making personal loans to directors continued. The testimony shows that BarVee was a sound business and had independent bank credit when it borrowed from Tovrea Company and repaid all Tovrea Company loans in full with interest.

There were several Maybe cattle business ventures from 1945 through 1957. Evans and others formed an early Maybe. Ed, Barnard and outsiders formed another. These existed until 1947 and the next Maybe was not formed until 1951 when a partnership was started by Barnard, Ed, Phil and others. It continued until 1957. Finally, a Maybe partnership was formed between T&C and Allstate cattle companies. Ed had a 50% interest in T&C. All of the Maybes bought, fed and sold cattle. Their cattle were fed at Tovrea Company pens and the feed bill was paid on a regular 30-day basis. To buy cattle and pay its feed bill, Maybe occasionally borrowed money from Tovrea Company, although they had independent bank credit. Tovrea Company made a profit in its dealings with the Maybe partnerships and all loans were repaid to Tovrea Company with interest.

Ed had a 50% interest in T&C Cattle Company. T&C was a customer feeder

of Tovrea Company and fed large numbers of cattle in Tovrea Company pens. The same types of loans were made to T&C, although it had independent bank credit, and again all loans were repaid with interest and Tovrea Company made a profit.

Agricultural Products Company was originally formed by Tovrea, Marley and another but Tovrea and Marley sold their stock in 1950. Tovrea Company bought cottonseed meal, hulls and oil from Agricultural Products and that company bought bale ties, gin supplies, bagging, tools, etc. from Tovrea Company's hardware store. The cottonseed oil was pumped by pipeline from Agricultural to the Tovrea Company packing plant and cottonseed hulls were blown through a pipeline to the mixing mill. This method was less expensive than trucking. The saving to Tovrea Company was approximately $30,-000 annually. Tovrea Company made a substantial profit in its dealing with Agricultural Products and all loans from Tovrea Company to Agricultural Products were repaid in full with interest.

Ed was a shareholder in the Gro-Gren companies which were in the retail manure fertilizer business for lawns and gardens. Tovrea Company was in the wholesale manure fertilizer business and sold to the Gro-Gren companies at a profit.

Tovrea and Marley owned stock in General Farms which came into existence in 1945 when Marley borrowed $40,000 from Tovrea Company to buy a farm in Mexico. It is conceded that this company did not compete with Tovrea Company and that Marley repaid the loan.

The Tovrea Equipment Company, later known as Tovrea Motors, was partially owned by Ed and Phil. The company sold motor fuel and vehicles to Tovrea Company.

Marley, Evans and Ed bought and owned cattle and fed them in Tovrea Company pens. Significantly, Marley, Evans and Ed bought cattle after Tovrea Company was given first choice and the Tovrea Company declined to purchase for reasons set forth herein.

There is no evidence that any of the above individual businesses or transactions were conducted secretly or in bad faith. They covered a considerable period of time and were known by all directors except defendant Wambach who was not aware of certain transactions pointed out below. Wambach became a director in 1955 representing the Linsenmeyer trust. He knew of loans to BarVee, Maybe and 96, but did not know the owners of these businesses. However, it is obvious that the transactions between Tovrea Company and the individual defendants or their businesses would not have been invalid if Wambach had voted against them.

To summarize, there was some competition between Tovrea Company and the businesses of the defendants; there were some transactions between Tovrea Company and businesses owned by defendants; there were loans by Tovrea Company to defendants and there were open accounts available to the officers of Tovrea Company on which they did not have to pay interest. The trial court concluded that some or all of these things constituted violations of the defendants' fiduciary duty to Tovrea Company that resulted in damage.

■ Before stating the principles of law applicable to the findings of the trial court and arguments, we must further discuss some of the facts set forth by plaintiffs in connection with these assignments of error. It is alleged that prior to 1947 the Tovrea Company conducted an extensive custom feeding operation for the defendant directors. No documentation in the transcript is cited and we need not search the more than eight thousand pages of record to find support for plaintiffs' statement of facts. 17 A.R.S. Rule 5(d), Rules of the Supreme Court. In any event, the allegation of an extensive custom feeding operation prior to 1947 is contrary to the record since the President's report of 1948 states that was the first full year of operation for the custom feeding division.

■ Plaintiffs contend the defendant directors purchased cattle in the name of "fictitious" enterprises with money borrowed from Tovrea Company. Plaintiffs refer to BarVee, Maybe, T&C and 96 discussed in plaintiffs' cross appeal. It is argued that these "fictitious" enterprises were created to keep the identity of the owners a secret from the minority shareholders. To use a corporate name different from the names of the individual owners is commonplace and does not support the conclusion that the owners so acted to keep their identities a secret. The commonly accepted meaning of "secret" is something which is intentionally undisclosed or something studiously and intentionally concealed, or a thing kept from general knowledge. Stammer v. Board of Regents of State of New York, 287 N.Y. 359, 39 N.E.2d 913. A transaction between an officer and his corporation is not secret where handled aboveboard and the records of the transaction are continuously available. Bay City Lumber Co. v. Anderson, 8 Wash.2d 191, 111 P. 2d 771. During oral argument, plaintiffs' counsel admitted Tovrea Company books were open for inspection at all times.

Plaintiffs claim the individual defendants had first choice on the purchase of cattle offered to Tovrea Company. The uncontradicted evidence is just to the contrary.

Plaintiffs argue that Tovrea intended to deceive the minority shareholders by requiring the annual balancing of open accounts but again we are not referred to the record. Concerning the open accounts, it is said that they were not allowed prior to 1932. The statement is irrelevant since it is not disputed that the accounts existed after 1932. Moreover, the source in the record of the conclusion is the following remark by Mrs. Della Tovrea Stuart:

"THE WITNESS: And I don't know a thing in the world about these companies that they are asking me about. And I don't know a thing. And I never saw a thing.

And it was always a policy that we never loaned people money."

That bare statement does not refer to open accounts and is without reference to time or place or person and contrary to the admitted Tovrea Company practice of loaning money.

In connection with loans from Tovrea Company to the individual defendants, plaintiffs claim a former director, Mickle, protested such action and proposed the above-mentioned 1947 resolution which was passed. Actually, by letter dated December 12, 1946 Mickle said he had first received official notice the previous September of notes payable in the amount of $2,700,000 and was told the money had been used to purchase the oil tankers. He said he had no recollection of the officers requesting the directors to approve the purchase. He voiced his disapproval and was joined by directors Evans and Della Tovrea Stuart. Mickle proposed two resolutions. First, that no loan be made to any officer or director of the company without a majority vote of the directors. Secondly, that no loan be made to any subsidiary corporations or corporations in which any officer or director of the company was a stockholder unless approved by a majority vote of the directors and unless such note was properly secured. As we noted above, the directors, with the exception of Marley who was absent, unanimously adopted the following resolution at the next meeting on January 21, 1947:

"RESOLVED, that no loan shall be made to any subsidiary corporation, or corporations, in which any officer or director of the Tovrea Packing Company is a stockholder, unless such loan is approved by a majority of the Board of Directors."

Personal loans to the directors were not prohibited nor was security required of loans to corporations in which the directors were shareholders.

Plaintiffs claim that interest was not paid on the loans made to the defendants and the businesses in which they were interested. The general ledger account exhibits are cited to support this conclusion

but they make no reference to interest one way or the other. The uncontradicted testimony is that interest was paid in full.

Plaintiffs contend that "At the time that Tovrea so graciously loaned $40,000 of the Tovrea Company funds to General Farms, the Tovrea Company owed banks in the amount of $700,000 at which time said loan could not possibly be construed as surplus funds." The record reference is to argument made by counsel to the court and not the testimony of any witness or party.

■ Plaintiffs further argue that there are statements that the defendants and the businesses in which they were interested had no independent bank credit and that Tovrea Company loans were therefore made in bad faith. The uncontradicted testimony is that the defendants and their businesses had established bank credit. In view of the fact that all loans were repaid in full with interest and no harm to Tovrea Company was shown, the question of the individual businesses independent bank credit becomes immaterial. In analogous situation, our statute states that "A thing is done 'in good faith' within the meaning of this article (Uniform Fiduciaries Act), when it is in fact done honestly, whether it be done negligently or not." A.R.S. § 14–1101, subsec. B. This court has held that good faith will insulate directors from liability for errors of judgment in the ordinary course of business if they act in good faith, although good faith will not protect them from liability for losses resulting from transactions that are unauthorized by the corporation articles or outside the ordinary scope of business unless consented to or ratified by the shareholders. Fagerberg v. Phoenix Flour Mills Co., 50 Ariz. 227, 71 P.2d 1022.

■ The legal principles applicable to this argument are well established and easy to state although often difficult to apply. Furthermore, we emphasize that each case of this kind must be decided upon its own facts.

■ It is well established that directors or officers may engage in a business similar or identical to that carried on by a corporation in which they are directors or officers, either on their own behalf or for another corporation of which they are directors or officers. There is no breach of fiduciary duty so long as they act honestly and in good faith and breach no specific duties owing to the corporation. Sequoia Vacuum Systems v. Stransky, 229 Cal.App.2d 281, 40 Cal.Rptr. 203; Little Roch Towel & Linen Supply Company v. Independent Linen Service Company of Arkansas, 237 Ark. 877, 377 S.W.2d 34; Golden Rod Mining Co. v. Bukvich, 108 Mont. 569, 92 P.2d 316; 3 Fletcher, Cyclopedia Corporations, § 856, p. 215 (1965 Rev.Ed.); Note, Fiduciary Duty of

Officers and Directors not to Compete with Corporation, 54 Harv.L.R. 1191, 1197; Ramsey, Director's Power to Compete with his Corporation, 18 Ind.L.J. 293, 299. The above authorities clearly indicate that the essential inquiry of the "business competition" doctrine is good faith. Good faith will insulate the directors or officers from liability unless the rival business is actually and demonstrably detrimental to the corporation. Industrial Indemnity Co. v. Golden State Co., 117 Cal.App.2d 519, 256 P.2d 677; Foley v. D'Agostino, 21 A.D.2d 60, 248 N.Y. S.2d 121; 3 Fletcher, supra, § 856, p. 217.

After 1947 the usual, ordinary and major portion of, Tovrea Company business was custom feeding. Only occasionally did it purchase cattle to reach the 10,000 head break-even point or when the profit picture was good. Cattle were purchased by Bar-Vee, the Maybes and T&C in which the individual defendants had interests and by Marley, Evans and Ed. There was no competition because from 1947 Tovrea Company's principal business was custom feeding and the businesses and the individual defendants were customers or Tovrea Company like any other customer. Furthermore, Tovrea Company had first choice on any cattle it wanted. The record shows that the defendants acted in good faith by conducting their individual businesses openly and with full knowledge of the majority of directors and stockholders. Furthermore, the transactions were record-ed in Tovrea Company records and plaintiffs' counsel conceded that Tovrea Company records were always open for inspection. We point out that plaintiffs have shown no detriment to Tovrea Company. In fact, Tovrea Company earned a substantial profit on the money it loaned to the defendants and as a result of the customer-custom feeding relationship.

■ The record does not support plaintiffs' charge that the defendants wrongfully deprived Tovrea Company of any business opportunities. The "business opportunity" doctrine holds that a director or officer may not seize for himself, to the detriment of his company, business opportunities in the company's line of activities in which it has an interest or prior claim. Guth v. Loft, 23 Del.Ch. 255, 5 A.2d 503; 3 Fletcher, supra, § 861.1, p. 227; Note, Corporate Opportunity, 74 Harv.L.R. 765. The general statement of the doctrine is too broad because there is much activity lying outside the duty of the director but within the scope of the corporation's business. The more precise test is whether the director has a specific duty to act in regard to the particular matter as a representative of the company. If there is no such duty, the director may acquire outside interests although the corporation may be more or less interested. Industrial Indemnity Co. v. Golden State Co., supra; Guth v. Loft, Inc., supra; 3 Fletcher, supra, § 862, p. 235. Although there is considerable overlap, the

distinction between the business competition doctrine and the business opportunity doctrine has been recognized, Lincoln Stores, Inc. v. Grant, 309 Mass. 417, 34 N.E.2d 704.

■ Arizona has spoken on the corporate opportunity doctrine in Zeckendorf v. Steinfeld, 12 Ariz. 245, 100 P. 784. This court said that whether a director or officer is duty-bound to purchase property for his corporation or to refrain from purchasing it for himself depends upon whether the corporation has a legally recognized interest, actual or in expectancy, in the property, or whether the purchase by the director or officer may hinder or defeat the plans and purposes of the corporation in carrying on or developing its legitimate and usual business.

■ We do not think Tovrea Company had any actual or expectant interest in the property, cattle or opportunities of the other companies in question. Nor do we think the other businesses defeated or hindered the business purposes of Tovrea Company. The cattle businesses became customers to Tovrea Company's profit. Tovrea explained that the fluctuating market was not a safe and satisfactory investment which was why Tovrea Company infrequently purchased cattle to feed in its custom pens but would lend money at interest to the individual defendants to do so. Tovrea Company's plans and usual business did not include the production of cottonseed meal

for feed as was the business of Agricultural Products, the retail sale of manure fertilizer as was the business of the Gro-Gren companies and the sale of vehicles as was the business of Tovrea Motors. We do not know the business of General Farms and cannot consider the application of the corporate opportunity doctrine. As to Agricultural Products, Gro-Gren and Tovrea Motors, there was no breach of the business opportunity doctrine by defendants and therefore no liability to plaintiffs.

Plaintiffs further argue that though the business opportunity or the business competition doctrines may not apply, any transactions between defendants and Tovrea Company are voidable by Tovrea Company regardless of whether the transaction is fair to Tovrea Company. Such is not the law.

■ The transactions between the defendants and Tovrea Company will be closely scrutinized but will be set aside only if they are unfair to Tovrea Company. Gould Copper Mining Co. v. Walker, 17 Ariz. 332, 152 P. 853; Garden Development Co. v. Warren Ranch, 35 Ariz. 254, 276 P. 839. The burden is on the defendant directors to prove the fairness of transactions entered into with the corporation, but proof may come from the plaintiffs' case. Alger v. Brighter Days Mining Corp., 63 Ariz. 135, 160 P.2d 346. There is no evidence of unfairness to Tovrea Company as

a result of transactions entered into between it and the various businesses in question. The only activity that might have supported such a conclusion were the loans from Tovrea Company to some of the defendants upon Tovrea's urging without a majority vote of the directors in violation of the above mentioned 1947 resolution. Yet, such loans are valid if free from fraud and fair to the company, Davies v. Meisenheimer, 254 Wis. 419, 37 N.W.2d 93; Barber v. Kolowich, 282 Mich. 143, 275 N.W. 797; Felsenheld v. Bloch Bros. Tobacco Co., 119 W.Va. 167, 192 S.E. 545, 123 A.L.R. 334; 3 Fletcher, supra, § 955, p. 463. It has been held that a corporation can loan its surplus funds at less than the legal interest rate to directors dominating the corporation where there is no fraud and no showing that the funds could have been invested at a more substantial interest yield. Felsenheld v. Bloch Bros. Tobacco Co., supra. If the corporation has power to make loans to its directors or officers in the first instance, it can ratify any loans improperly made. Bank of Florala v. American Nat. Bank of Pensacola, 199 Ala. 659, 75 So. 310.

■ Arizona has recognized that a shareholder with the majority vote cannot use his vote to ratify an illegal transaction. Franklin v. Havalena Mining Co., 16 Ariz. 200, 141 P. 727. But an unauthorized transaction between a director and his corporation may be validated by the acquiescence of the other directors or by the body of the shareholders and thus the right to avoid the contract may be waived. No independent or substantive act of ratification is required. Acquiescence with knowledge and acceptance is sufficient. Keystone Copper Mining Co. v. Miller, 63 Ariz. 544, 164 P. 2d 603. However, we need not decide this particular point on the theory of ratification or waiver since the loan transactions were fair and profitable to Tovrea Company in view of the fact that they were repaid in full with interest.

■ Next, we consider the open accounts which allowed officers to draw against their income without paying interest which practice was of long-standing. Since we have indicated there was no breach of fiduciary duty or violation of the business competition or business opportunity doctrines or as a result of loans to the defendants, the only possible damage attributable to the open accounts is that interest was not earned. The Oklahoma Supreme Court faced the same situation in Dobry v. Dobry, 324 P.2d 534 where it was held that interest as a separate item could not be recovered where directors had not paid interest on their open accounts of long standing. We agree.

Plaintiffs rely upon decisions included among those we have cited. They cite also Dragoon Marble etc. Co. v. McNeish, 28 Ariz. 96, 235 P. 401 and Garden Development Co. v. Warren Ranch, 35 Ariz. 254,

276 P. 839 as authority for the conclusion that "a loss of profit is not a gain" and is therefore detrimental to the company. This argument is made to counter the defendants' claim that Tovrea Company was not harmed by the operation of defendants' personal businesses, which could have been operated by Tovrea Company, because it made a profit from transactions entered into with those businesses. The cases do not support plaintiffs' contention. In the Garden Development case the plaintiff shareholder brought suit to cancel a lease between two corporations dominated by a single director on the ground that the lease was unfair to the corporation in which he, the plaintiff, owned stock. The court said we follow the rule stated in Dragoon Marble that a transaction between a director or his business interest and the corporation will be set aside upon the slightest evidence of unfairness to the corporation. The court examined the lease and affirmed the trial court's decision that it was unfair because it required the corporation to surrender its most valuable asset for a term of twenty-five years in return for purely speculative benefits. The Dragoon case dealt with a flagrant attempt by a director to destroy his corporation by, among other things, preventing it from raising money to satisfy a judgment he held against it. Neither of these cases support plaintiffs' position.

Plaintiffs state that Tovrea Company account receivable records pertaining to

Agricultural Products were not generally known to exist and were brought to the plaintiffs' knowledge only at the time of trial. They then cite 19 C.J.S. Corporations § 786, p. 161 and the cases of Phoenix Title Co. v. Alamos Land Co., 24 Ariz. 499, 211 P. 570; Heffern Co-operative etc. Co. v. Gauthier, 22 Ariz. 67, 193 P. 1021; Garrett v. Reid-Cashion Land etc. Co., 34 Ariz. 245, 270 P. 1044 and Monterey Water Co. v. Voorhees, 45 Ariz. 338, 43 P.2d 196. 19 C.J.S. says:

"A director or other officer may not directly or indirectly derive any personal profit or advantage by reason ·of his position, and if he does he must account to the corporation for secret profits made in violation of his duty. The transaction, if the officer's interest is disclosed, may be authorized or ratified."

The quotation and the case citations are consistent with what we have said above.

The applicable principle from the Phoenix Title Co. case is that the officer of a corporation cannot exercise his duty to further his own interest when it conflicts with the interest of the corporation. The Heffern case held that a majority stockholder will not be allowed to vote his stock in ratification of a grossly unfair contract and thereby appropriate corporate property to his own benefit. The Garrett decision dealt with the same type of limitation upon

the majority shareholder concerning a corporate merger. The Monterey Water Co. case involved an action to cancel a note issued by the corporation to pay the fraudulently claimed salary of the general manager who controlled the company. None of these decisions alter the legal principles we have stated or their application to the facts of this case.

Defendants next challenge the following finding:

"The court further finds that P. E. Tovrea, Sr., and Edward A. Tovrea purchased personal property and corporate assets located at the place of business of the corporation on their own terms (said sale taking place on December 1, 1958) and that said assets were not purchased for cash as provided in the terms of sale.

"The court finds that since the defendants had not purchased the said assets for cash, as was provided in the terms of sale, that the defendant corporation is entitled to an amount equal to 5% of the purchase price of said personal property with interest on same until this date."

Defendants contend there is no competent evidence "that the terms of sale provided for payment in cash, or that P. E. Tovrea, Sr. and Edward A. Tovrea did not purchase the personal property under the terms provided in the sale, or that they did not purchase same for cash, and it is contrary to the undisputed evidence that they purchased the personal property strictly in accord with the terms of sale."

There is considerable evidence to support defendants' argument, but we need only decide whether the record supports the trial court's narrow finding that Tovrea and Ed did not purchase the Tovrea Company's personal property—which plaintiffs claim should read real property—for cash as required by the terms of Tovrea Company's offer. The court further held that Tovrea Company is entitled to an additional 5% of the purchase price of the personal property with interest. There was no finding that the transaction was fraudulent or unfair to Tovrea Company or that Tovrea and Ed paid less than fair market value. The facts of the transaction are as follows:

Liquidation of Tovrea Company was approved by a resolution of the stockholders adopted February 14, 1958. The purpose was to realize a substantial tax savings of approximately $700,000 if all assets could be sold within one year. The resolution provided:

"1. The proper officers of the corporation are authorized to sell such of the assets of the corporation at such prices and upon such terms as may be approved by the board of directors."

.*      *      *      *      *      *

"III. The officers and directors of the corporation are authorized to take all such steps as may be necessary to (sic) appropriate to carry out the purpose and intent of this resolution and to effect a complete liquidation of this corporation prior to February 14, 1959, to the end that—pursuant to the provisions of Section 337 of the Internal Revenue Code, no gain or loss shall be recognized to this corporation from the sale or exchange by it of property within such 12-month period."

The plaintiff-shareholders were present at that meeting and voted for the resolution. After unsuccessful efforts to sell the assets other than inventories which had been sold, the directors adopted a revised schedule of cash prices and provided for a 5% discount to stockholders who purchased directly from Tovrea Company thereby saving the brokers' fees. In the President's progress report to the stockholders it was unequivocally stated that "any stockholder interested in purchasing one or all of the parcels is entitled to a Five (5) per cent discount off the prices shown if purchased directly from the corporation and no broker is involved." The revised schedule of prices, prepared in September and advertised in the newspaper on October 12, 1958, recited that the terms were cash and listed the properties as including improvements and in one case a Number 6 license, concededly a liquor license. The advertisement did not specifically mention personal property. In any event, the November 28, 1958 offer from Tovrea and Ed referred to the parcels listed in the advertisement "together with all improvements, equipment and personal property thereon, including the corporation's No. 6 and No. 7 liquor licenses" and some land in New Mexico and the corporation's rights in an option agreement with Della Tovrea.

The price offered was the total advertised price less 5% plus separate amounts for the option rights and New Mexico land, and the terms provided for full payment within approximately thirty days. These offers were considered in detail by the directors out of the presence of Tovrea and were accepted by the unanimous vote of the directors including Wambach who represented the Linsenmeyer interests.

Plaintiffs allege many facts not supported by the evidence. It is said that the failure to liquidate before Tovrea and Ed's offer was due to the defendants' deliberate refusal to sell to anyone else. No reference is made to the record and the evidence supports the conclusion that Tovrea's offer was the only one close to the asking price of the assets. Plaintiffs complain that the offer was accepted the same day it was presented to Tovrea Company. Yet no conclusion of specific impropriety is made. Plaintiffs contend that Tovrea's offer should have been presented to the minority stockholders. No authority is cited.

It is argued that Tovrea Company's advertisement to sell did not include personal property and required cash terms, and that neither condition was complied with by Tovrea and Ed. This argument assumes they intended to accept Tovrea Company's offer. Actually, Tovrea and Ed made a counteroffer which was accepted by the Tovrea Company. Hence, we need not reach the questions of whether they were entitled to a 5% discount and whether that discount applied to a cash transaction or a transaction directly with the Tovrea Company. The counteroffer clearly designated the parties, property, price and terms and was accepted by the Tovrea Company.

If we assume Tovrea and Ed accepted the Tovrea Company's offer, it is far from clear that they were not entitled to the 5% discount. That discount was available to stockholders dealing directly with the Tovrea Company. There is no evidence to support the trial court's finding that the discount related to a cash transaction.

If we did accept the court's determination that the discount depended upon a cash deal, it can be argued that Tovrea and Ed substantially complied with that condition. The Tovrea Company received cash within thirty-two days after entering into the agreement. The purpose of the cash term was to comply with the tax provisions which required sale of the assets by February 14, 1959. The thirty-two day payoff satisfied that requirement. Our decision on this point, however, is that Tovrea and Ed made a counteroffer which was accepted by the Tovrea Company. Therefore, the terms and conditions of Tovrea Company's original offer are irrelevant and it follows that the trial court's finding imposing liability because of noncompliance with that original offer is erroneous.

Plaintiffs' reliance upon Starkweather v. Conner, 44 Ariz. 369, 38 P.2d 311 and Tevis v. Beigel, 156 Cal.App.2d 8, 319 P.2d 98 is ill-founded. Starkweather dealt with a transaction between agent and principal and imposed upon the agent the burden of showing good faith and fair dealing. The Tevis case imposed the same duty upon an officer in a transaction with his corporation. Neither decision is contrary to the legal principles hereinbefore expressed.

Defendants next assign as error the following finding:

"The court finds that the corporation purchased 19 oil tankers from the United States of America on or about the 17th day of May, 1946, by the president of the corporation, Phil E. Tovrea, Sr., for an amount in excess of the sum of $2,800,000.00.

"The court finds that these tankers were purchased without the consent or knowledge of the Board of Directors and without a resolution of the

corporation authorizing the purchase thereof.

"The court further finds that during this period of time that there may have been implied authority insofar as the corporation was concerned to deal in the purchase, sale, and handling of surplus property; but that this authority did not extend to the directors to encumber the assets or jeopardize the financial status of the corporation without corporate resolution to the extent of any substantial sum, and it is unconscionable to believe that the directors could encumber and jeopardize the assets of the corporation to the extent of $2,800,000.00 without specific authority and authorization by appropriate resolution from the Board of Directors.

"The court further finds that by reason of the financial condition of the corporation at the time of this purchase that good economical practice should have indicated to the Board of Directors that to indulge in negotiations leading to the execution of the contract in the amount of $2,800,000.00 should not only have been authorized by resolution of the Board of Directors but that by virtue of the magnitude of the transaction involved that it would have been, in view of the financial status of the corporation at the time, almost imperative that the directors secure authorization from the stockholders to negotiate such a transaction. This would be especially true in view of the financial status of the corporation at the time of the execution of the contract, and on account thereof heavy losses were suffered by the corporation to the detriment of the plaintiffs."

Defendants argue that the purchase of the tankers was not an ultra vires transaction, the trial court specifically ruled that the claim for damages arising from the purchase was barred by the statute of limitations and that the court erred in permitting plaintiffs, over objection, to amend their pleadings to conform to the evidence which allegedly revealed that Tovrea purchased the tankers on his own behalf with Tovrea Company money.

It is unnecessary to recite a detailed history of the purchase and disposal of the tankers which resulted in a loss to Tovrea Company of approximately $700,-000.00. The Tovrea Company unquestionably had power under its articles of incorporation to deal in such property. In the case of Fagerberg v. Phoenix Flour Mills Co., supra, this court said:

"It is the general rule that officers and directors of a corporation are authorized to handle the ordinary business affairs of the corporation according to their best judgments, and, if, acting in good faith within the scope

of the corporation's ordinary business, they commit errors of judgment, they are not liable therefor, but it is equally true that, if they go outside of the ordinary and usual business of the corporation and engage in transactions unauthorized by its articles of incorporation and not within the ordinary scope of its business, *without the consent or ratification of the stockholders,* then good faith will not excuse them from responsibility to the corporation for any losses which they may have incurred by reason of their unauthorized and illegal conduct." 50 Ariz. at p. 232, 71 P.2d at p. 1024 (Emphasis supplied)

▮ The purchase of the tankers was within the Tovrea Company's authorized business under its charter and arguably within its ordinary business since it had been dealing in war surplus material. In any event at the oral argument, plaintiffs' counsel conceded ratification of the transaction. In fact, at the annual stockholders meeting held February 2, 1948, a resolution was unanimously adopted ratifying, approving and confirming all official acts of the officers and directors of the Tovrea Company. Hence, the rule of the Fagerberg case applies and there can be no recovery apart from any bar imposed by the statute of limitations. But we think the statute of limitations does apply.

A.R.S. § 12–542, subsec. 4 provides for a two year limitation on actions based upon taking or carrying away the goods of another. A.R.S. § 12–543, subsec. 3 provides for a three year limitation upon actions grounded in fraud. A.R.S. § 12–544 allows four years to bring an action for an accounting between partners which is a similar fiduciary situation. And the general limitation for all actions not otherwise provided for is four years. A.R.S. § 12–550. Plaintiffs' cause of action regarding the purchase of the tankers is barred regardless of which statutory provision applies.

▮ If plaintiffs' theory was fraud, this court has held that the statute of limitations runs from the time the aggrieved party should have discovered the fraud in the exercise of reasonable care and diligence. Mere silence by the person allegedly committing the fraud will not avoid the running of the statute. There must be positive acts of concealment done to prevent detection. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. Guerin v. American Smelting etc. Co., 28 Ariz. 160, 236 P. 684. These principles have been applied to a stockholders derivative suit such as is before us. Davis v. Harrison, 25 Wash.2d 1, 167 P.2d 1015. Counsel admitted that plaintiffs knew of the purchase of the tankers. There is no evidence that defendants attempted to conceal the purchase, handling, disposal or financial re-

sults of the tanker transaction. The statute of limitations ran from the time of purchase.

■ Plaintiffs further argue that the purchase was by Tovrea individually which fact was not discovered until trial. This is without merit. The trial court found that the oil tankers were purchased by the Tovrea Company and the evidence supports that finding. Furthermore, the record shows that the purchase was ratified by the shareholders at the annual meeting held February 2, 1948.

■ The action is likewise barred if plaintiffs' theory was a conspiracy to defraud. We have held there is no such thing as a civil action for conspiracy. The action is one for damages arising out of the acts committed pursuant to the conspiracy. Hale v. Brown, etc., 84 Ariz. 61, 323 P.2d 955. The damage for which recovery may be had in such a civil action is not the conspiracy itself but the injury to the plaintiff produced by the specific overt acts. The statute of limitations begins to run at the time the act is committed, Rutkin v. Reinfeld, (2nd Cir.) 229 F.2d 248, though damages continue to flow thereafter. Glassberg v. Boyd, 35 Del.Ch. 293, 116 A.2d 711. The alleged act of impropriety in this case was the purchase of the tankers which occured in May, 1946. Plaintiffs filed suit March, 1958 almost twelve years later.

■ This court has held that no matter what the form of action, if it is based upon fraudulent concealment by one occupying a fiduciary relationship or position of trust to the complaining party, the statute of limitations does not begin to run until that party discovers or is put upon reasonable notice of the breach of trust. Taylor v. Betts, 59 Ariz. 172, 124 P.2d 764. When a person has reasonable notice of a breach of trust must depend upon the facts of each case, but the California court shed some light upon the problem in Pourroy v. Gardner, 122 Cal.App. 521, 10 P.2d 815 at 819 when it said:

"True, no duty rests upon stockholders to examine the books or minutes of the corporation, either constantly or at intervals, for the purpose of detecting illegal or fraudulent transactions committed against the corporation or its directors (Reid v. Robinson, 64 Cal. App. 46, 220 P. 676); nevertheless where the circumstances are such as to put a person of ordinary intelligence and prudence on inquiry, or where there are gross laches in not making any effort to discover the real facts which might have been discovered by the use of slight diligence, the statute of limitations cannot be avoided, and the knowledge which thus might have been obtained is imputed as of the time of the commission of the fraud."

The decisions relied upon by plaintiffs are not in point. Sumid v. Cairns, 25 Ariz. 597, 220 P. 1084 dealt with an express trust and held that the statute of limitations to determine adverse possession does not run until the trustee unequivocally repudiates his trust because the possession of the trustee is presumed to be the possession of the cestui que trust. Jack Waite Min. Co. v. West, 55 Ariz. 301, 101 P.2d 202 was also an express trust case and held, among other things, that the cestui que trust may not shut his eyes and refuse to recognize a plain warning that the trust has been or is about to be repudiated, and thereby avoid the statute of limitations. Garrett v. Reid-Cashion Land etc. Co., 34 Ariz. 245, 273, 270 P. 1044 deals with the rule permitting relief to one who enters into a transaction ignorant of his antecedent existing legal rights. Doehler Metal Furniture Co., Inc. v. United States (2nd Cir.) 149 F.2d 130 dealt with a contract interpretation. Drews v. Eastern Sausage and Provision Co., Inc., D.C., 125 F.Supp. 289 at 291 states that a stockholder's derivative suit was barred if the corporate action was barred by the statute of limitations but that the statute was tolled during the period when the nonresident alien could not bring suit. Reid v. Robinson, 64 Cal.App. 46, 220 P. 676 recognizes an exception to the above rule when the corporation cannot bring suit because dominated by the directors committing the wrong. In such a case, the stockholder is not barred by virtue of any limitation upon the corporation, although he may be barred if he fails to bring suit within the statutory period after acquiring knowledge of the wrong. Alger v. Brighter Days Min. Corp., 63 Ariz. 135, 160 P.2d 346 and Barr v. Petzhold, 77 Ariz. 399, 273 P.2d 161 were laches cases and the former held a minority stockholder guilty of laches though the suit was brought within the statute of limitations. Hammons v. National Surety Co., 36 Ariz. 459, 287 P. 292 and City of Bisbee v. Cochise County, 44 Ariz. 233, 36 P.2d 559 had nothing to do with the tolling of the statute of limitations because in both cases suit was brought soon after the plaintiffs discovered facts giving rise to their causes of action and well within the statute of limitations.

In view of our above holdings, it is unnecessary to consider defendants' arguments that the trial court's finding and conclusions will not justify reference to a master and that plaintiffs failed to state claims upon which relief could be granted. We may proceed to plaintiffs' cross-appeal.

Plaintiffs claim four items should have been included in the trial court's findings: (1) the defendant-officers were not entitled to receive bonuses because they were mismanaging the corporation; (2) defendants improperly competed with Tovrea Company through the 96 Cattle Company; (3) the stock purchased by Tovrea from Della Tovrea Stuart in 1947 belongs to the Tovrea

Company; (4) the personal property of the Tovrea Company, with the exception of a Number six liquor license, was not legally purchased by Tovrea and Ed.

We have already considered the validity of the purchase by Tovrea and Ed of Tovrea Company assets during liquidation. Plaintiffs present no additional arguments. The only objection of the trial court to the transaction was the 5% discount which we have heretofore considered.

The 96 Cattle Company was a partnership in which Ed had a 50% interest. It bought, raised and fed cattle some of which were finished in Tovrea Company pens at a profit to Tovrea Company. The 96 Company borrowed money from Tovrea Company although it had independent bank credit. It repaid all loans in full with interest and paid its feed bill on a regular thirty-day basis. It was a customer of Tovrea Company's custom feeding operation.

The legal principles and conclusions we stated in the main appeal in connection with the relationship between Tovrea Company and BarVee, the Maybes and T&C apply here.

Plaintiffs next argue that "defendant directors voted a bonus for themselves while they occupied the position of an employee (sic) of the defendant corporation when they were not entitled to it since they knew themselves guilty of fraudulent practices, secret profits, ultra vires acts, acts of mismanagement, breach of fiduciary relationship and a general conspiracy to defeat the rights of the defendant corporation and the minority stockholders thereof." Since plaintiffs' conclusion that the bonuses were void depends on the finding that the defendants otherwise breached their fiduciary duty, this assignment of error must fail in view of our determination that the defendants did not breach their fiduciary duty.

Plaintiffs' assignment must also fail because they have not assigned as error the trial court's finding that the bonus claim was barred by the statute of limitations. They sought to correct this error by amendment of assignment of errors and, on the merits, argue that the statute of limitations does not run against an act which is contrary to public policy. The Arizona cases cited do not support the conclusion. Waugh v. Lennard, 69 Ariz. 214, 211 P.2d 806 and Munger v. Boardman, 53 Ariz. 271, 88 P.2d 536 dealt with estoppel. City of Bisbee v. Cochise County has been considered above. Olsen v. Union Canal & Irr. Co., 58 Ariz. 306, 119 P.2d 569 quotes from Red Rover Copper Co. v. Industrial Com., 58 Ariz. 203, 214, 118 P.2d 1102, 1107, 137 A.L.R. 740 where it was said that "No contractual consent, no statute of limitations, no laches nor estoppel can prevail against public policy, and any agreements made and any acts done in

violation of it are necessarily void." Nowhere have plaintiffs referred us to cases in support of their contention that it is contrary to our public policy for directors to vote corporate employees annual bonuses under the facts of this case. Nor has our research produced such a holding.

Plaintiffs next argue that "The purchase of Della Tovrea Stuart's stock in the defendant corporation by Phil E. Tovrea, Sr., with company funds, when he was not financially able to purchase it on his own, was an ultra vires act of a fraudulent nature and a breach of the fiduciary relationship that he had with the Tovrea Company and that said transaction is subject to being set aside with the ownership being taken in the Tovrea Company name with all of the accruing benefits derived therefrom from date of sale in 1947."

In 1947, Della Tovrea Stuart was opposed to the sale of the packinghouse to the Cudahy Company and decided to sell her stock in the Tovrea Company. Tovrea had intended to purchase all outstanding stock and Mrs. Stuart accepted his offer. He borrowed the purchase price from the Valley National Bank on his own credit, and he secured his indebtedness by a promissory note payable to the bank and accompanied by an assignment of the beneficial interest in the stock. He subsequently transferred his bank note to Tovrea Company at 4% interest on the security of the stock and eventually repaid the loan with interest.

We point out that the Tovrea Company had no interest in its outstanding stock or in dealings between its stockholders and no claim that offers to sell stock be submitted to the Tovrea Company first. Adams v. Mid-West Chevrolet Corporation, 198 Okl. 461, 179 P.2d 147, 175 A.L.R. 554. The only aspect of the stock sale from Mrs. Stuart to Tovrea which plaintiffs can question on behalf of the Tovrea Company is the loan from the Tovrea Company to Tovrea to pay the bank. The legal principles we have stated above concerning transactions between a director and his company apply in this situation. Since there is no evidence that the loan was unfair to the Tovrea Company, the transaction is valid.

The relief requested in the cross appeal is denied.

The defendants did not breach their fiduciary duty owing to Tovrea Company by virtue of any business competition between Tovrea Company and the defendants' individual businesses or the companies in which they owned interests which were Bar-Vee, the Maybes, T&C and 96. The defendants did not breach their fiduciary duty to Tovrea Company by virtue of acquiring business opportunities in Agricultural Products, Tovrea Motors, Tovrea Equipment, the Gro-Grens and General Farms because Tovrea Company did not have any actual or expectant interest in these businesses.

Moreover, Tovrea Company realized a substantial profit in its dealings with these businesses. The record shows that the transactions between Tovrea Company and the defendants or the businesses named above in which the defendants owned interests were fair to Tovrea Company. Tovrea Company realized a substantial profit from its dealings with defendants and these businesses. The open accounts of the defendant-officers do not support a cause of action for interest. When Tovrea and Ed offered to purchase liquidation assets which offer was accepted by the Tovrea Company, the contract was fair to Tovrea Company. The transactions whereby money was loaned to the defendants were fair to Tovrea Company. Tovrea Company had no interest in the stock which Tovrea purchased from Mrs. Della Tovrea Stuart. Finally, the statute of limitations bars an action based upon the purchase of the oil tankers. The evidence is not sufficient to support the trial court's finding that the defendants, pursuant to a scheme and design, fraudulently and through ultra vires mismanaged and breached their fiduciary relationship with Tovrea Company.

The judgment of the trial court is reversed and the trial court is directed to enter judgment for defendants.

STRUCKMEYER, C. J., and UDALL, LOCKWOOD and McFARLAND, JJ., concurring.